Zigmund C. PORTER, et al., Plaintiffs,

v.

SHEARSON LEHMAN BROTHERS INC., et al., Defendant.

Civ. A. No. H-90-3251.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 3, 1992.

Roger B. Greenberg, Houston, Tex., for plaintiffs.

Philip J. John, Houston, Tex., for defendant Shearson Lehman Bros., Inc.

Gerard G. Pecht, Houston, Tex., for defendants Energy Assets Intern. Corp., Hutton Completion Services Inc. and Energy Assets Capital Corp.

## MEMORANDUM AND ORDER

WERLEIN, District Judge.

Pending is a Motion to Dismiss and, in the Alternative, for Summary Judgment or Partial Summary Judgment (Document No. 4) filed by Defendants Energy Assets International Corporation ("EAIC"), Energy Assets Capital Corporation ("EACC"), and Shearson Lehman Brothers, Inc. ("Shearson"). The motion was filed December 14, 1990. Plaintiffs Zigmund C. Porter, et al., filed their Memorandum in Opposition to Defendants' Motions to Dismiss and Motions for Summary Judgment (Document No. 9) on February 4, 1991.[1]

On August 28, 1991, the Honorable John D. Rainey, United States District Judge, referred the motion to United States Magistrate Judge Frances H. Stacy for a Memorandum and Recommendation. From the start, matters outside the pleading had been presented to and were not excluded by the Court and both Plaintiffs and Defendants recognized the motion would be treated as one for summary judgment and disposed of as provided in Rule 56. Fed. R.Civ.P. Rule 12(b).[2] On March 18, 1992, the Memorandum and Recommendation of the Magistrate Judge was filed recommending that Defendants' Motion for Summary Judgment be granted. (Document No. 55). Subsequently, Defendants filed an Objection (Document No. 58) to the Magistrate Judge's Memorandum and Recommendation with respect to one sentence, in which the Memorandum stated in effect that, although the investment programs at issue have returned a portion of the original invested principal, they have failed to produce any real profits. Defendants contend the summary judgment evidence shows that the four programs at issue have now returned all of the original investment principal and additional profits. No citation is given to any such summary judgment evidence, and the objection is OVERRULED.

On April 1, 1992, Plaintiffs filed Objections to the Magistrate Judge's Memorandum and Recommendation (Document No. 61). Plaintiffs allege that the Memorandum and Recommendation of the Magistrate Judge is flawed by procedural errors, the assumption of facts not in evidence, and erroneous conclusions of law. After having reviewed the summary judgment record, the Court is of the opinion that the Memorandum and Recommendation of the Magistrate Judge fairly describes the summary judgment proof and correctly recommends the entry of summary judgment for Defendants. The memorandum of the Magistrate Judge is adopted by the Court, as supplemented by the additional reasons and analysis set forth herein.

■ First, decision in this matter hinges upon a proper understanding of Fed. R.Civ.P. Rule 56, and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). While a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, there is no "express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S.

---

1. Also pending is Plaintiffs' Motion to Dismiss the Counterclaim filed herein by Defendant Energy Assets International Corporation. Judge Rainey also referred this motion to United States Magistrate Judge Frances H. Stacy for a Memorandum and Recommendation, which in turn was filed on March 23, 1992. Judge Stacy recommended that the Counterclaim be dismissed without prejudice. No objections have been filed, and for the reasons set forth in her Memorandum and Recommendation, the Counterclaim will be dismissed without prejudice.

2. Plaintiffs' counsel filed a Rule 56(f) affidavit with Plaintiffs' initial response.

at 323, 106 S.Ct. at 2553. Thus, even without supporting affidavits from the movant, summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

■ Where the non-moving party will bear the burden of proof at trial on a dispositive issue, as in both *Celotex* and the case at bar, Rule 56(e) "requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

■ In this case Plaintiffs' primary allegations are that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, promulgated thereunder, in the offering and sale to Plaintiffs of limited partnership units in oil and gas completion programs from 1982 through 1985.

■ In her Memorandum and Recommendation, the Magistrate Judge has correctly set forth the six elements which must be proved by Plaintiffs to establish such a claim.[3] Moreover, as the Magistrate Judge correctly observes, every element of an offense under Section 10(b) must be met. The Fifth Circuit has emphasized: "We stress the importance of recognizing, of course, that every element of an offense under Section 10(b) must be met." *Chemetron Corp. v. Business Funds, Inc.,* 718 F.2d 725, 728 (5th Cir.1983).

Defendants' motion is based in part upon Plaintiffs' failure "to demonstrate any misstatement or omission by any of the defendants which raises a legally viable claim,"

to plead anything "which would indicate the required scienter or intent to defraud on the part of the defendants," and the failure of plaintiffs "to prove the necessary elements of a claim for violation of Section 10(b) and Rule 10b–5." Defendants' Motion, at 2. Defendants specifically set forth in their supporting memorandum the six elements given above which Plaintiffs are required to prove. Defendants' Memorandum, at 22. Moreover, Defendants asserted in their supporting memorandum that

> Plaintiffs in this case cannot meet the burden of proving a 10(b) offense because they cannot specify material misstatements or omissions indicating intent to deceive or defraud (scienter) in connection with the sale or purchase of any security upon which plaintiff reasonably relied to their detriment. Plaintiffs' 10(b) claims, therefore, are inadequate as a matter of law.

Defendants' Memorandum, at 23.

The Defendants having properly raised by their motion Plaintiffs' inability to show fact issues on essential elements upon which Plaintiffs carry the burden of proof, under *Celotex* it was essential that Plaintiffs "go beyond the pleadings" and "demonstrate facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Fed.R.Civ.P. Rule 56. This Plaintiffs failed to do.

Plaintiffs' failure to demonstrate a genuine issue for trial is all the more remarkable because in a case such as the one pleaded here, the essential elements required to prove a Rule 10b–5 violation should largely be within the personal knowledge of claimants alleging that they are the victims of claimed misrepresentation. Nonetheless, there is no affidavit from even one of the "89 Plaintiffs"[4] that

---

**3.** The elements are: (1) a material misrepresentation or omission or other fraudulent device; (2) purchase or sale of a security in connection with a fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentations or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the

fraudulent device. *See Laird v. Integrated Resources, Inc.,* 897 F.2d 826, 832 n. 13 (5th Cir.), *reh'g denied,* (1990), for a review of Fifth Circuit decisions.

**4.** The Court does not know the basis for the repeated reference of Plaintiffs' counsel to "89 Plaintiffs," a number also used by the Magistrate Judge. *See, e.g.,* Plaintiffs' Objections at 4,

sets forth any material facts that Defendants allegedly misrepresented, or that on oath states that Plaintiffs relied upon any such claimed misrepresentation, or that states that any claimed misrepresentation or omission was material, or which states that any asserted fraudulent device employed by Defendants resulted in a compensable injury to any one or more of the Plaintiffs. In fact, none of the Plaintiffs filed an affidavit at all.[5] Moreover, no affidavit of any other person with personal knowledge of the facts was submitted by Plaintiffs to demonstrate a genuine issue for trial on the Section 10(b) and Rule 10b–5 claims. Because Plaintiffs' cause of action requires proof of the essential elements listed above, upon which Plaintiffs bear the burden of proof, their unsupported pleadings and the arguments of their counsel are insufficient to defeat Defendants' motion for summary judgment.

■ As noted above, Plaintiffs' counsel did file a Fed.R.Civ.P. Rule 56(f) affidavit in which he contended that additional facts could be obtained through discovery. This affidavit sought two specific depositions, one of Defendants' employee John Walker, from whom he expected to establish what net profits were obtained by Defendants from their alleged fraud, and the other of J.P. Bryan, another of Defendants' employees, from whom he hoped to establish the degree to which Bryan or his agents impeded inquiries from investors and how Defendants dealt with investor inquiries. Plaintiffs' attorney indicated further that various documents could be identified by taking discovery of Defendants and that the documents would provide additional information about Defendants' conduct.

Although Rule 56(f) is given liberal application in the Fifth Circuit and in this Court, "[b]ecause the burden on a party resisting summary judgment is not a heavy one,"

the nonmovant must present specific facts explaining his inability to make a substantive response as required by Rule 56(e) and "conclusively justify his entitlement to the shelter of rule 56(f)." *Securities and Exchange Comm'n v. Spence & Green Chemical Co.,* 612 F.2d 896, 901 (5th Cir. 1980) *cert. denied,* 449 U.S. 1082, 101 S.Ct. 866, 66 L.Ed.2d 806 (1981). The nonmovant is required to show "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Id.* (quoting *Willmar Poultry Co. v. Morton–Norwich Products, Inc.,* 520 F.2d 289, 297 (8th Cir.1975), *cert. denied,* 424 U.S. 915, 96 S.Ct. 1116, 47 L.Ed.2d 320 (1976)). *See also Washington v. Allstate Ins. Co.,* 901 F.2d 1281, 1285 (5th Cir.1990); *United States v. Little,* 712 F.2d 133, 135 (5th Cir.1983). In this instance, there is no showing in the Rule 56(f) affidavit of specific facts explaining why a continuance was needed to gather from any of the Plaintiffs even the simplest of affidavits sufficient to raise fact issues on those matters presumably best known to Plaintiffs themselves and which were, after all, essential elements in their alleged cause of action. Nor is there any explanation in the Rule 56(f) affidavit of why fact issues on those essential elements could not be demonstrated through the affidavits of one or more of the Plaintiffs. Indeed, even if the additional discovery desired from Defendants by Plaintiffs' counsel yielded the kind of information hoped for by him in his affidavit, such still would have raised no issue of fact on such essential elements as whether Plaintiffs justifiably relied on any misrepresentations of Defendants, or whether Plaintiffs, or any of them, suffered compensable injuries. Under these circumstances, where Plain-

---

22; Memorandum and Recommendation at 36. The Amended Complaint signed by Plaintiffs' attorneys includes in the title of the action the names of 101 plaintiffs, counting couples as one and eliminating one duplication. This is the source from which the Court ascertains the identity of the parties. Fed.R.Civ.P. Rule 10(a).

**5.** It appears from the summary judgment evidence that Plaintiffs' counsel trolled among several thousand persons who had invested in these programs—sending to them correspondence and numerous puff pieces marked "advertising material"—in order to land these 101 (or 89) Plaintiffs. See note 4, above at 6.

tiffs have raised no issues of fact on essential elements uniquely within their presumed knowledge, a Rule 56(f) affidavit is insufficient to warrant a continuance in order generally to pursue discovery. Plaintiffs wholly fail to show that they could not for the reasons stated in their attorney's Rule 56(f) affidavit present facts essential to justify their opposition to Defendants' Motion for Summary Judgment.

The foregoing largely responds to the objections filed by Plaintiffs to the Magistrate Judge's Memorandum and Recommendation. Plaintiffs argue that they were apprehensive that the case would be dismissed as barred by the statute of limitations and, therefore, it would have been "costly and wasteful for the Plaintiffs to submit their entire evidence, including 89 affidavits." Plaintiffs' Objections, at 4. They assert again that Plaintiffs "hoped to avoid the expense of filing affidavits from all plaintiffs, a total of 89 affidavits, together with other evidentiary material, ..." Plaintiffs' Objections, at 22.

■ Of course, avoidance of unnecessary expense in litigation is laudable, but such cannot excuse nonmovants from demonstrating fact issues on the essential elements of their claims when faced with a motion for summary judgment.[6] Moreover, Plaintiffs' objections to the Memorandum and Recommendation of the Magistrate Judge are largely premised upon the belief that "Defendants never met their burden sufficient to warrant a summary judgment recommendation." Plaintiffs' Objections, at 18. They write that "Defendants failed to establish, by proper evidence or precedent, that they deserve a summary judgment on the merits." *Id.*[7] And thus, I return to where I began, with the importance of understanding Rule 56 in light of the clear tutorial of *Celotex*.[8] The material issues of fact which needed to be demonstrated were not required to be negated by Defendants but rather were required affirmatively to be shown by Plaintiffs. In their motion and in their supporting memorandum Defendants properly directed the attention of the Court to the essential elements of Plaintiffs' alleged cause of action upon which Plaintiffs have the burden of proof, and challenged the ability of Plaintiffs to establish fact issues on those essential elements. Plaintiffs, without assigning any excuse except their desire "to avoid the expense" of preparing and filing their own affidavits, failed to present minimal evidence by affidavit or otherwise which is sufficient to raise a genuine issue for trial on those essential elements. Their counsel's Rule 56(f) affidavit failed to specify facts as to why such minimal proof could not be made by Plaintiffs without the benefit of a continuance.

As supplemented by the additional reasons and emphasis set forth herein, the Memorandum of the Magistrate Judge is accepted and adopted as the Opinion of the Court. Summary judgment is GRANTED to Defendants, and Plaintiffs' Amended Complaint is DISMISSED on the merits

---

6. The "expense" argument seems odd anyway. Obtaining affidavits from the Plaintiffs undoubtedly must be a much easier and far less expensive exercise than trudging through the remnants of the former E.F. Hutton Company and its activities *circa* 1982–85.

7. Other examples of Plaintiffs' mistaken belief that they could defeat summary judgment by pointing to Defendants' lack of evidence, include the following:

Significantly, the Defendants did *not* produce *any* evidence that their brokers did *not* communicate the essence of the sales materials to the Plaintiffs, as the Plaintiffs alleged. Plaintiffs' Objections at 12 (emphasis by Plaintiffs). [N]o affidavit was submitted [by Defendants] stating that 'internal' documents were never

shown to clients, or that their contents were never revealed to clients in oral sales pitches. *Id.* at 13.
Defendant Shearson Lehman did not submit a single affidavit from any of its employees, so the Magistrate did not have any evidence before her regarding the broker's activities in selling these securities. *Id.* at 19–20.

8. *See also James v. Nico Energy Corp.,* 838 F.2d 1365, 1372 (5th Cir.1988) ("Where the nonmoving party bears the burden of proving an issue at trial, as in this case, that party cannot rest upon its pleadings, but must produce tangible evidence suggesting that a genuine issue of fact exists.")

except for their state law claims; Plaintiffs' state law claims are DISMISSED without prejudice; and Defendant Energy Assets International Corporation's Counterclaim is DISMISSED without prejudice.

JUDGMENT will be entered accordingly. The Clerk will enter this Memorandum and Order and notify all parties.

## MEMORANDUM AND RECOMMENDATION

STACY, United States Magistrate Judge.

Pending before the Court is a motion to dismiss (Instrument No. 4) filed by Defendants Energy Assets International Corporation ("EAIC"), Energy Assets Capital Corporation ("EACC") and Shearson Lehman Brothers, Inc. ("Shearson")[1] pursuant to Fed.R.Civ.P. 12(b) and 9(b) and in the alternative a motion for summary judgment or partial summary judgment pursuant to Fed.R.Civ.P. 56(b). The motion was filed on December 14, 1990. On August 28, 1991, United States District Judge John D. Rainey referred the motion to United States Magistrate Judge Frances H. Stacy for a Memorandum and Recommendation.

After considering the motion, submissions of the parties, and applicable law, the Magistrate Judge RECOMMENDS that the Defendant Shearson's motion for summary judgment be GRANTED.

## I. STATEMENT OF FACTS.

Between 1983 and 1986, the Plaintiffs, Zigmund C. Porter, et al. ("Porter") purchased securities issued in the form of units[2] in limited partnership programs (the "Programs")[3] organized, underwritten, distributed, sold and managed by Defendant.[4] Porter claims to have informed the selling brokers of their investment objectives, namely "income", "capital preservation and appreciation", "tax shelter", or "a secure source of retirement income". The purchases were made based upon the disseminated information and the specific recommendation of Shearson's account executives. The brokers purportedly represented that the Programs (1) were "insured" with "low risk" or "no risk" and (2) met Porter's investment objectives. Porter claims he was never told that he could lose some and possibly all of his invested funds.

The units were sold via offering materials including a prospectus. In signing the subscription agreement contained within the prospectus wrapper, each investor acknowledged receipt of the prospectus. Additionally, they represented and warranted nine items including meeting suitability standards and recognizing the limited liquidity of the investment before investing.

The Programs were "income oriented." They were designed to acquire working interests[5] in oil and gas properties by investing in the completion and equipping phase of the development of oil and gas wells that would generate income on a reg-

---

1. Shearson's liability is premised solely upon its acquisition on January 21, 1988 of 90% of the outstanding shares of the E.F. Hutton Group, Inc. and its wholly owned subsidiaries including E.F. Hutton & Company, Inc. ("Hutton") and Hutton Completion Services ("HCS"). As part of the acquisition, Shearson assumed all the obligations and liabilities of Hutton and its subsidiaries.

2. The units were sold in increments priced at $500 per unit with a minimum investment of $5000 (10 units).

3. The limited partnerships programs consisted of Hutton/Energy Assets Insured Oil and Gas Completion Program ("H/EA-1"), Hutton/Energy Assets 2nd Oil and Gas Completion and Equipping Program ("H/EA-2") and Hutton/Energy Assets 3rd Energy Program ("H/EA-3") (collectively referred to as the "Pro-

grams"). Each Program was to consist of up to three limited partnerships.

4. Hutton underwrote, distributed and sold the securities. EACC acted as a managing sales agent and an underwriter of the Programs. EAIC was an organizer and a general partner of the Programs. EAIC also managed the day-to-day affairs of the partnership and reviewed venture prospects and logging data, engineering information and production data. HCS was a general partner of the Programs. EAIC and, in certain cases, HCS monitored expenditures and commitments made or entered into on behalf of the partnerships.

5. As defined in the prospectus: "that interest in an oil and gas leasehold, the owner of which has the right to receive revenues and the obligation to bear the expense of development, operation or maintenance application to his interest."

ular basis.[6] Program funds were used to finance joint ventures with selected independent oil and gas companies to pay completion, equipping and other related costs. In turn, program investors became equity owners with the oil companies in the product from the completed wells. The income generated would be distributed on a quarterly basis.

All of the Programs provided for the partnerships to purchase insurance against "the unsuccessful completion of wells" or "a non-productive well." In addition, all of the Programs provided some tax sheltering advantages.

Shearson created for and distributed to its brokers internal sales memoranda[7] containing salient features of the Programs and Shearson's viewpoint of the oil and gas industry. Shearson marked these memoranda in one of two ways: (1) diagonally across each page in large type with the warning "FOR INTERNAL USE ONLY, NOT TO BE SHOWN TO CLIENTS OR PROSPECTIVE CLIENTS" or (2) the notation "INTERNAL–OFFICE MEMORANDUM" contained in a contrasting announcement section.

Additionally, Shearson created and distributed a slide presentation for the exclusive viewing of its brokers. Slide one of the presentation states as follows:

"This is for internal use only by Registered Brokers/Dealers and not for release to the general public.

This presentation is qualified by the Prospectus and does not constitute a solicitation to buy which can only be made by the Prospectus."

Each of the subsequent slides contain a notation "This is for internal use only by Registered Brokers/Dealers and not for release to the general public."

These internal sales memoranda and the slide presentation were allegedly intended to be used solely by Shearson's brokers as aids to better understand the Programs in order to solicit interest. The materials made available to the brokers for external use were the prospectuses, brochures, video tapes, approved advertisements, and seminar materials consisting of mini-flip charts and a slide presentation with script.

The introductory slide of the presentation suitable for the general public viewing provided the following:

"This is neither an offer to sell nor a solicitation of an offer to buy any of these securities. An offer is made only by Prospectus and only in those states where the securities may be lawfully offered or sold.

This presentation is to be viewed only by prospective investors who have received the Prospectus."

This information is colored primary yellow set against a black background and in the same type size and color as the program features. The program features slide provided the following:

"Relatively lower risk

Insurance

Upside potential

Timeliness

Tax advantaged cash distributions"

During the first quarter of 1986, the oil and gas industry experienced a precipitous and unexpected decline in the value of the underlying commodities.[8] This adversely affected the early performance of the Programs. Although each of the Programs have returned a portion of the original in-

---

6. The cycle of development of an oil and gas well is typically accomplished in three phases: (1) the property acquisition, (2) the actual drilling of the well, and if hydrocarbons appear to be present at the conclusion of the drilling phase, (3) completion and equipping of the well.

 Each of the Programs offered an investment in this third phase, which consists largely of buying and installing pipe in the well bore, and buying and installing other equipment used to produce, collect, store, and transport oil and gas.

7. Known as "Blue Tops."

8. In the 1970's, oil and gas were "boom" investments and the price of oil was steadily increasing. In the early eighties, the trend reversed and the price of oil collapsed. By 1986, the oil industry was in a deep depression. Oil fell from $35 a barrel in 1980, to as low as $11 a barrel.

vested principle [9], they have failed to produce any real profits. Thus they have not generated the anticipated regular income stream for the investors.

The assets of H/EA–1 were placed in a liquidating trust. The final distribution will be made upon liquidation. In July 1990, investors from H/EA–2 and –3 adopted a Plan of Consolidation in which the assets of the partnerships of those Programs and certain other entities were exchanged for common stock. As part of the consolidation, the partners elected to be governed by the Texas Revised Uniform Limited Partnership Act.[10] The partnerships were dissolved and liquidated. The stock received by the partnership was distributed to the partners.[11]

After allegedly being retained by some of the investors, Beigel and Sandler sent to all the limited partners of the Programs a solicitation letter dated January 22, 1990, enumerating the potential claims against the Defendant. A follow-up solicitation letter was sent on November 5, 1990. Copies of both letters were filed with the Illinois Attorney Registration and Disciplinary Commission as required. Both letters were marked as "Advertising Material" and contained an explanation that the Illinois Rules of Professional Conduct required the contents to be labeled as such.

On March 2, 1990, EAIC sent a letter to all limited partners delineating the company's views of the allegations set forth in Beigel and Sandler's letters.

Porter [12] filed suit on October 19, 1990 alleging the following counts:

*Against Shearson*

1. Violation of Section 10(b) of the Security and [Securities] Exchange Act of 1934, 15 U.S.C. § 78j(b)—sale of unsuitable securities.

4. Breach of fiduciary duty (duty owed to client).

*Against EAIC and HCS*

5. Breach of fiduciary duty (mismanagement of the limited partnerships).

*Against All Defendants*

2. Violation of Section 10(b) of the Security and [Securities] Exchange Act of 1934, 15 U.S.C. § 78j(b)—fraud in the offering materials.

3. Common law fraud.

6. Violation of the federal RICO Act, 18 U.S.C. §§ 1961 *et seq.*

Essentially, Porter claims that:

(i) the offering materials allegedly failed to disclose and misrepresented material facts namely: a) the risks associated with the investment; b) the economic conditions of the oil and gas industry; c) the reasonableness of Shearson's projections of oil and gas prices; and d) the benefits of the Programs' insurance; (ii) Shearson's account executives purportedly misrepresented the Programs as "insured" with "no risk" or "low risk"; (iii) Shearson directed its brokers to disseminate information to prospective investors contained in the "internal use only" memoranda; (iv) all of the Defendants conspired, aided or abetted in violating the federal RICO Act and (v) as a result of these wrongful acts Porter's investments are now worthless.

Porter is seeking the amount of his investment less any distribution received, consequential damages, interest, costs and disbursement of this action, punitive damages on the common law fraud, treble damages on the RICO claim, and attorney's fees.

On December 14, 1990, EAIC filed a counterclaim for damages against Porter for violation of Article 10 of the Texas Revised Limited Partnership Act.

---

9. As of March 31, 1990, an investor in H/EA–1 received 71.88%, H/EA–2A received 52.64%, H/EA–2B received 50.76% and H/EA–3 received 51.04% of his principle.

10. Under the "TERMS OF OFFERING" section The Prospectus provided that "the Partnerships be formed pursuant to the Texas Uniform Limited Partnership Act."

11. Limited partners in H/EA–2(A) and H/EA–2(B) received 320 and 319 shares respectively for each $10,000 investment. Limited partners in H/EA–3 received 485 shares per $10,000 investment.

12. Less than one percent of the Programs investors joined in the suit.

On February 5, 1992, United States Magistrate Judge Frances H. Stacy ordered Porter to file a RICO case statement.

## II. CONVERSION OF SHEARSON'S RULE 12(b)(6) MOTION TO A RULE 56 SUMMARY JUDGMENT MOTION IS APPROPRIATE.

Porter argues that Shearson's motion is premature and should be denied because the Plaintiff has not been extended "reasonable opportunity to present any pertinent material." The Court finds his argument inconsistent with established federal law.

The last sentence of Fed.R.Civ.P. 12(b) provides that a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted shall be converted into a motion for summary judgment and disposed of as provided in Fed.R.Civ.P. 56 whenever matters outside the pleading are presented to and accepted by the court. Either the pleader or the moving party or both may bring the conversion provision into operation by submitting extraneous matters. *Hadges v. Yonkers Racing Corp.*, 733 F.Supp. 686 (S.D.N.Y. 1990).

The Court of Appeals for the Fifth Circuit has long recognized that materials filed concurrently with the pleadings are sufficient to convert a motion to dismiss into one for summary judgment. *General Guar. Ins. Co. v. Parkerson*, 369 F.2d 821 (5th Cir.1966). The Court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion. *Isquith on behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 193 n. 3, (5th Cir.1988) quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 (1969), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). This discretion is exercised on the basis of a determination of whether or not the proffered material, and the resulting conversion from the Rule 12(b)(6) to the Rule 56 procedure, is likely to facilitate the disposition of the action. *Id.* When the extra-pleading material is comprehensive and will enable a rational determination of a summary judgment motion, the court is likely to accept it; when it is scanty, incomplete, or inconclusive, the court probably will reject it. *Id.*

Once the court has decided to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment. *Kaminsky v. Rosenblum*, 737 F.Supp. 1309 (S.D.N.Y. 1990); *see also, Carter v. Stanton*, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972), *on remand* 350 F.Supp. 1337 (S.D.Ind.1972), *vacated on other grounds*, 416 U.S. 918, 94 S.Ct. 1917, 40 L.Ed.2d 277 (1974). In fact, it is reversible error for the district court to consider outside matter without converting the motion to dismiss into a motion for summary judgment. *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir.1982) *cert. denied* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984).

As soon as a motion to dismiss under Rule 12(b)(6) is converted into a motion for summary judgment, the requirements of Rule 56 become operable. It is important that the court give the parties notice of the changed status of the motion and a "reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." *Festa v. Local 3 International Brotherhood of Electrical Workers*, 905 F.2d 35 (2d Cir.1990). Within the meaning of the rule providing that a motion to dismiss for a failure to state a claim for relief may be treated as a summary judgment motion if all the parties are given a reasonable opportunity to present any pertinent material, the term "reasonable opportunity" includes some indication by the court to all the parties that it is treating the motion as one under Rule 56. *Dale v. Hahn*, 440 F.2d 633 (2d Cir.1971) *cert. denied* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974). Formal notice will be excused when the parties were otherwise apprised of the conversion. *Dubied Machinery Co. v. Vermont Knitting Co.*, 739 F.Supp. 867 (S.D.N.Y.1990). *See also Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine*

*Corp.*, 932 F.2d 442 (5th Cir.1991) (court can order summary judgment *sua sponte* provided losing party has been given adequate notice and opportunity to respond); *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir.1986) (court's acceptance of material from outside pleadings was sufficient in itself to notify plaintiffs of the possibility of conversion).

Porter was on notice that the Court might choose to consider the instant motion as one for summary judgment as Shearson framed its motion as one to dismiss for failure to state a claim and for summary judgment. Thus Porter's arguments that he has "had *no* opportunity to present any materials pertinent to this motion" fail. (Emphasis in the original Plaintiff's memorandum in opposition to Defendant's motion to dismiss). The record reflects that Porter filed, concurrently with his memorandum in opposition to Defendant's motion to dismiss, (1) unauthenticated copies of Shearson's internal sales memoranda, approved advertisements, internal pro forma cash flow projections, and seminar invitations, (2) EAIC's letter to the limited partners, and (3) a sworn affidavit, pursuant to Fed.R.Civ.R. 56(f), by Plaintiff's attorney, Steven A. Ramirez. The Court notes that Ramirez' affidavit is not based on "personal knowledge" but contains only an attorney's opinion of what he can prove given an adequate opportunity for discovery.

Moreover, Porter has had extensive opportunity to file sworn affidavits by any one of the 89 individual investors pursuant to Fed.R.Civ.P. 56(c). Porter could have submitted sworn affidavits with any of his pleadings: (1) complaint, (2) memorandum in opposition to Defendant's motion to dismiss, (3) motion to amend complaint, (4) motion for leave to file amended complaint, (5) sur response in opposition to Defendant's motion to dismiss pursuant to Rule 9(b), (6) memorandum in opposition to Defendant's motion to stay discovery, (7) memorandum in support of Plaintiff's motion to dismiss Defendant's counterclaim, (8) response to Defendant's motion for leave to file reply in the event the Court decides to consider rather than stay Defen-

dant's Rule 12(b) and Rule 56 motion, and (9) RICO case statement. The Court notes the complete absence of this form of evidence.

■ If there is sufficient relevant evidence which, under the applicable substantive law, would enable a reasonable jury to return a verdict in favor of the party opposing summary judgment, then a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* The existence of a genuine issue of material fact will preclude summary judgment. Fed.R.Civ.P. 56(c).

■ Summary judgment is properly granted on fraud-based claims where a court determines there are no affirmative misrepresentations of material facts. *James v. Nico Energy Corp.*, 838 F.2d 1365, 1372 (5th Cir.1988).

### III. ALLEGED VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b–5 OF THE SECURITIES EXCHANGE COMMISSION.

In order to establish a claim for relief under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, promulgated thereunder, Porter must prove the following elements:

(1) a material misrepresentation or omission or other fraudulent device; (2) purchase or sale of a security in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device.

*Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 888, n. 6 (5th Cir.1987); *Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 832 n. 13 (5th Cir.1990) (review of Fifth Circuit decisions).

The Court of Appeals for the Fifth Circuit has stressed that every element of an offense under Section 10(b) must be met. *Chemetron Corp. v. Business Funds Inc.*, 682 F.2d 1149, 1162 (5th Cir.1982). Conclusory allegations regarding these elements are insufficient to survive a motion to dismiss or a motion for summary judgment. "[I]n order to state a cause of action under Section 10(b), a plaintiff must plead *facts* that would amount to manipulation or deceptive conduct proscribed by that section and Rule 10b–5." *Pin v. Texaco, Inc.*, 793 F.2d 1448, 1451 (5th Cir.1986).

Porter has not met his burden of proving a Section 10(b) offense because he has not specified material misstatements or omissions indicating intent to deceive or defraud in connection with the sale or purchase of any security upon which the Plaintiff reasonably relied to his detriment. Therefore Porter's Section 10(b) claims are inadequate as a matter of law.

### A. FRAUD IN THE OFFERING MATERIALS—ALLEGED ORAL AND WRITTEN MISREPRESENTATIONS OR OMISSIONS.

■ In evaluating whether a statement is misleading under the federal securities laws, a court must consider the total mix of information possessed by the investors. *See Diamond v. Arend*, 649 F.Supp. 408, 415 (S.D.N.Y.1986); *Basic Inc. v. Levinson*, 485 U.S. 224, 230–32, 108 S.Ct. 978, 982–83, 99 L.Ed.2d 194 (1988). This means not only the written materials distributed by the Defendant, oral statements allegedly made by the Defendant but also information disseminated via newspaper, radio and television as well as common knowledge imputed to the general public. *See Laird v. Integrated Resources, Inc.*, 897 F.2d 826, 837 (5th Cir.1990); *Newman v. Rothschild*, 651 F.Supp. 160 (S.D.N.Y.1986) (that virtually any investment contains a "certain degree" of risk falls within the category of the universally known); *Zerman v.*

*Ball*, 735 F.2d 15, 21 (2d Cir.1984) ("[i]t is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market.")

Porter alleges that the Shearson's brokers purportedly "told" him that the programs were (1) "insured" [13] with (2) "low risk" or "no risk" and (3) that he would receive "100% return on capital in four years." [14]

Porter relies heavily on extracted parts of one internal memorandum, dated November 23, 1982, and created and distributed in conjunction with the first Program. The clear language of this memoranda, when read in totality, shows that the initial touting is to gain the brokers' attention and not, as Porter alleges, the investors' attention. The Court notes that not one of the investors filed a signed affidavit alleging that he was sent a copy of this internal memorandum.

The complete first section of the internal memorandum reads and is formatted as follows:

*"INTRODUCTORY STATEMENT—* Would a 20% + annual yield, mostly sheltered (tax free) over the first five years interest you? Would an insurance policy guaranteeing no risk from *Lloyds of London* get your attention? Does HUTTON'S name on the prospectus help? Read on.... (Emphasis in original.)

*We are introducing a new issue—*(H/EA)—another example of your firm's continuing efforts to be the leading edge on Wall Street for Tax Sheltered Products. This investment opportunity could very well be the highest yielding vehicle ever offered by E.F. Hutton. (Emphasis added.)

(H/EA) could make your Xmas alot (sic) whiter!!!!

---

**13.** Porter alleges that the Programs' insurance was "merely a marketing ploy to make investors believe that the risks were non-existent or contained."

**14.** This prediction was based on Shearson's commodity price assumptions contained in the *internal* cash flow projections memoranda. Neither the prediction nor the cash flow projections were contained in the offering materials.

*Please,* generically, PRE–SELL PRE–SELL PRE–SELL PRE–SELL." (Emphasis in original.)

Another section titled "SALIENT FEATURE *FOR CLIENTS*" contained the following:

"A) Velocity of cash flow 29.6% est. avg. annual yield thru (sic) year 4, with over 75% being sheltered = 100% return of principle,

B) HUTTON Is the Co-general partner & designed the EFH/EA structure,

C) LLOYDS OF LONDON insurance protection against dry hole risk for 6 months,

D) NO DRILLING

E) 92% if (sic) L.P. initial capital investment goes in the ground,

F) G.P. is on the line for 10% "heads up" with L.P.

G) World economic recovery will push oil & gas prices higher = our inventory becomes more valuable,

H) The Stanger Report ranks this in the lowest possible risk category,

I) Only $40MM offering/limited time to analyze prospectus." (Emphasis added.)

Additionally, Porter alleges that material information was not disclosed in the offering materials, including (1) the risk of total loss of investor's capital, (2) Shearson's predictive information concerning future oil and gas prices and (3) Shearson's estimated rate of return on capital. Porter contends that by virtue of these oral and written misrepresentations or omissions, all Defendants are liable for violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission.

### 1. The Insurance Was Not Intended To Protect Investors' Capital.

The "Summary" section of each of the prospectuses contained a section defining the type of insurance the partnership would obtain and the role it would play in the Programs.

Under the heading "INSURANCE", the prospectus of H/EA–1 stated that:

"[e]ach Partnership will obtain Insurance effected with certain domestic and foreign insurers *insuring substantially all of its Completion and Equipping Costs if a well is not successfully completed as a Commercial Well.* Additionally, such *Insurance protects the Partnership from certain cost overruns* resulting from unanticipated occurrence during the completion of a well. See 'PROPOSED ACTIVITIES—*Insurance*'." (Emphasis added.)

Additionally the prospectus of H/EA–2 defined:

"a not successfully completed as a Commercial Well" as "(i.e., a non-productive well)" and *directed potential investors to turn to the "Proposed Activities–Insurance" section "for premium costs, deductibles and other information relating to such insurance coverage."* (Emphasis added.)

The prospectus of H/EA–3 further developed the information provided by the other two programs by stating that:

"[e]ach Partnership obtains Insurance effected with one or more international insurers with respect to *insuring its expenditures for Completion, Equipping and Related Costs if a well is not successfully completed as a Commercial Well (i.e., a non-productive well.* Additionally, such insurance protects the Partnership *from certain costs resulting from unanticipated occurrences during the completion of a well.* With respect to insuring other Costs of Oil and Gas Activities, *additional types of insurance coverage including, but not limited to, producing performance guarantee and business premium costs, deductibles* and other information relating to insurance coverage." (Emphasis added.)

Furthermore the "Marginal and Shut–In Wells" subheading of the prospectus' "RISK FACTORS" section stated additional information regarding the respective Program's insurance. H/EA–1 warned that:

"... *if a well is shut-in for more than 180 days after completion* and prior to

the commencement of marketing (exclusive of spot sales as a result of testing procedures), *insurance coverage for Completion and Equipping Costs will not be available to the Partnership, unless otherwise agreed to by the insurers.*" (Emphasis added.)

H/EA–2 warned that:

". . . if a well is shut-in for more than 180 days *continued coverage is subject to the approval of the insurers.*" (Emphasis added.)

H/EA–33 warned that:

". . . shut-in wells *may adversely affect the timely return of the Partnership's investment.*" (Emphasis added.)

Thus the Programs were insured against non-productive wells or shut-in wells for a period of six months, not against loss of capital.

2. The Risks Are Conspicuous, Clear And Readily Understandable.

 Prominently noted on the front of the prospectus of each of the Programs was the following:

"The Program permits investors to participate in the economic potential of oil and gas exploration and development without incurring the dry hole risks normally inherent in such activities:

The partnerships' funds will be at risk only after wells have been drilled and evaluated.

The partnerships will be insured against the unsuccessful completion of wells.

While investors will receive certain tax benefits associated with their investment in the Program, the partnerships are not tax shelters. . . .

"THIS OFFERING INVOLVES CERTAIN RISKS.

See 'Risk Factors'."

This bold warning is set off from the rest of the page by one-half inch of space above and below in which dark lines separate the risk warning from other print.

Turning to the heading "RISK FACTORS", the prospectus enumerated four pages of risks; fourteen to fifteen specific risks followed by three to four general risks associated with the Programs. The pertinent paragraphs are as follows:
"Specific Risks" . . .

"Marginal and Shut–In Wells". The prospectus for H/EA–1 warned that:

"[a]lthough the Partnership is insured against the risk of unsuccessful well completion, *there can be no assurance that completed wells will produce oil or gas in sufficient quantities to recoup the Partnership's investment* in such wells." (Emphasis added.)

The prospectuses of H/EA–2 AND –3 warned that:

"*there can be no assurance that completed wells will produce oil or gas in sufficient quantities to recoup the Partnership's investment* in such well or in any activity related to such wells, including but not limited to, processing or transportation." (Emphasis added.)

"New Entities". In warning potential investor that the partnerships were new entities, the prospectus for H/EA–2 stated that:

"[t]here can be no assurances that a partnership will be able to enter into Participation Agreements on favorable terms with Operators or others or the Partnership Revenues will exceed expenditures." (Emphasis added.)

Similarly, the prospectuses for H/EA–1 and –3 warned that:

"there can be no assurance that a partnership will be able to enter into ventures on favorable terms with Operators." (Emphasis added.)

The H/EA–1, –2 and –3 prospectuses contained the following under each respective risk heading:

"Diversification. The *ability of the General Partners to diversify the risks* involved in the operations of the Partnerships *will vary* in relation to the amount of subscriptions received by the Partnership." (Emphasis added.)

"Limited Transferability and Liquidity. . . . There will be *no ready market for*

*the Limited Partnership Interest.* Limited Partners will have the right, subject to certain conditions, to present their Limited Partnership Interests for purchase by the Partnerships. There can be no assurances that a Partnership will have sufficient funds available to satisfy its obligation to purchase Limited Partnership Interest. *Investors should, therefore, expect to bear the economic risk of an investment in a Partnership for an indefinite period of time.*" (Emphasis added.)

"**General Risks**"...

"**Competition and Markets.** *The oil and gas industry is highly competitive, and others in the industry possess financial resources and technical staffs significantly greater than those available to the General Partners.*

*The ability of the Ventures to market production will depend* in part on the levels of domestic production and crude oil imports, the availability an costs of competitive fuels, proximity of gas pipelines and federal and state regulations, all of which are variable factors dependent *upon economic and political forces which cannot be predicted. There have been reductions of natural gas sales in many areas because of the current surplus of natural gas production. Delays, restrictions or reductions of natural gas production may be experienced as a result of pipeline capacity limitations or natural gas surpluses.* See 'COMPETITION, MARKETS AND REGULATION'." (Emphasis added.)

The Programs disclosed specifically the risk of loss of capital, the risk of association with a new entity, the potential inability to diversify operations, the limited transferability of the investment and the risks incurred in an oil and gas investment. The warnings are conspicuous, clear and readily understandable. There can be no credible argument that Porter was unaware of the risk before he invested.

 A prospectus that "bespeaks caution" will not support an allegation of mis-

representation under Section 10(b). *Brown v. E.F. Hutton Group,* 735 F.Supp. 1196, 1201 (S.D.N.Y.1990); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (when "an offering memorandum unequivocally warns potential investors of the risks involved with investing in limited partnerships," Section 10(b) liability will not lie.); *Feinman v. Schulman, Berlin & Davis,* 677 F.Supp. 168, 170–71 (S.D.N.Y.1988). The securities laws' policy of "full disclosure" is met when the relevant documents fully disclose the risks involved. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977). Therefore, the written offering materials given to Porter are not misleading within the meaning of Section 10(b).

3. Reliance Upon Any Statements Outside The Written Representations In The Prospectus Is Unjustified.

The prospectuses also contained the following warning in bold type:

"**No person has been authorized to give any information or to make any representations, other than those contained in this Prospectus, and if given or made, such information or representations must not be relied upon.** .... The delivery of this Prospectus at any time does not imply that the information herein is correct as of any time subsequent to its date." (Emphasis added.)

 Reliance on oral statements which are directly contradicted by clear language or the offering memorandum through which the plaintiffs purchased their securities cannot be a basis for a federal securities fraud claim. *Brown v. E.F. Hutton Group,* 735 F.Supp. 1196, 1202 (S.D.N.Y. 1990), *citing Kennedy v. Josephthal & Co.,* 814 F.2d 798 (1st Cir.1978) (affirming summary judgment for defendants because offering memorandum's candid warnings made any reliance unjustified as a matter of law.); *Arrizza v. Jefferson Guar. Bank,* 696 F.Supp. 204 (E.D.La.1988); *George v. Blue Diamond Petroleum, Inc.,* 718 F.Supp. 539 (W.D.La.1989).

 Furthermore, where an investor is presented with oral representations in the

offer or sale of an investment which conflict with written representations made in the prospectus, or where he is expressly warned in the prospectus that any oral representations which are inconsistent with the written representation contained therein are unauthorized and are not to be relied upon, it is not *reasonable* for an investor to rely upon such oral representation and as a matter of law the element of justifiable reliance is not satisfied. *Platsis v. E.F. Hutton & Co.*, 642 F.Supp. 1277, 1299 (W.D.Mich.1986) *citing Zobrist v. Coal–X, Inc.*, 708 F.2d 1511, 1518–19 (10th Cir.1983) (investor acted recklessly by intentionally closing his eyes to and failing to investigate the contradictions between the misrepresentations and the information in the memorandum). (Emphasis in original).

"Moreover any reasonable investor knows to be somewhat wary of a selling agent's oral representations and check them against written materials". *Brown*, 735 F.Supp. at 1202; *See also Metzner v. D.H. Blair & Co.*, 689 F.Supp. 262, 264 (S.D.N.Y.1988); *Center Sav. & Loan Ass'n v. Prudential–Bache Secur., Inc.*, 679 F.Supp. 274, 277 (S.D.N.Y.1987).

■ It is not reasonable for Porter to have relied on statements made outside of the prospectuses allegedly representing an oil and gas investment as "no risk" or "low risk", considering the massive flood of negative information regarding the state of the oil and gas industry in 1983–1986 when they made the investments. "All investors, no matter how 'unsophisticated' would know or at least suspect, that there would be risks associated with the oil and gas investment at that time, given the much-publicized downward trend of the industry." *Brown*, 735 F.Supp. at 1202 (affirming summary judgment for the defendants

concerning an investment in a 1983 oil and gas limited partnership program); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990) ("like a stock market crash, the collapse of the oil prices in the early 1980's reverberated throughout the economy.")

Porter has admitted receiving documents detailing the risks of the investments.[15] Porter was informed that no individual was authorized to make representations involving the Programs and that he was to rely solely upon the written prospectus. Therefore, Porter's reliance upon any statements outside the written representations in the prospectus is unjustified as a matter of law.

Porter is also deemed to have received obvious information concerning the status of the oil and gas industry considering the overwhelming amount of oil and gas information publicized at that time. Porter is deemed to know, as an investor in a program that made him an equity owner in a commodity, that if the price of that commodity drops the ability of his investments to sustain profits through the sale of the commodity is reduced.

### 4. Disclosure Or Non–Disclosure of "Soft Information." [16]

■ Porter alleges that (1) Shearson omitted material information from the offering materials concerning the basis for its estimated return on capital, (2) Shearson's internal memoranda projections were not reasonably based and (3) Shearson's brokers repeated the internal memoranda projections to the investors.

Shearson's internal memoranda disclosed the basis for its anticipated return on capi-

---

**15.** Porter signed a subscription agreement admitting receipt of a prospectus.

**16.** "Soft information" is defined as "opinions, predictions, analyses, and other subjective evaluations, ..." as distinguished from "hard information," which is defined as "statements concerning objectively verifiable historical fact." J. Kerr, *A Walk Through The Circuits: The Duty to Disclose Soft Information*, 46 Md.L.Rev. 1071, 1076–109 (1987).

"Although a comprehensive definition of soft information is not readily apparent, several non-exclusive and non-exhaustive categories can be identified: (1) forward-looking statements concerning the future, such as projections, forecasts, predictions, and statements concerning plans and expectations...." C. Schneider, *Nits and Grits, and Soft Information in SEC Filings*, 121 U.Pa.L.Rev. 254, 255 (1972).

tal invested. The 1982 pro-forma cash flow was based on "non-escalating $32 a barrel oil and $3 mcf gas." The 1984 and 1985 pro-forma cash flow projections pricing scenario assumed "certain contract prices remain flat and in those cases assumes current price and cost hold constant through 1984 and then escalate at 6% per annum to a cap in 1995." The internal memoranda also stated: "Pay-out to investor is estimated to occur within 4 years." Porter alleges these predictions are material and would have impacted his decision to invest in the Programs if they had been disclosed.

■ Rule 10b-5 does not exempt predictive statements. The rule explicitly offers protection against a certain kind of statement: one that is misleading because it either fails to state a material fact or states a material fact falsely. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 203 (5th Cir.1988) quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 (1969), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988).

Up to the early 1970's, the SEC prohibited companies from including most predictive information in the documents filed with the SEC. The reason for the SEC's position was clear.

> "The Commission's internal application of a balancing test resulted in the view that the risks flowing from the disclosure of possibly over-optimistic management predictions and other projections of company performance outweighed any benefits derived by investors. The *SEC's perception of the unreliability of soft information, it potential to mislead investors*, and the lack of sufficient Commission resources to evaluate its accuracy quickly *negated any benefits flowing from the disclosure of such information.*" (Emphasis added.)

J. Kerr, *A Walk Through The Circuits: The Duty to Disclose Soft Information,* 46 Md.L.Rev. at 1073.

However in 1976, the SEC recognized that disclosure of certain soft information may be material to an investor making an informed decision with regard to a corporation's future earning power. The SEC stated it would not object to the disclosure of projection of future economic or corporate performance in public filing, as long as the disclosure of such information was made in good faith, had a reasonable basis, and was accompanied by information sufficient to permit informed investment decisions. At that time the SEC recognized that "the use of projections would assist in the protection of investors and would be of public interest." Securities Act Release No. 5362 at 82,667. In 1978, the SEC issued a statement *encouraging, although not requiring,* disclosures of management projections both in the filings with the SEC and in general. *See* Guides for Disclosure of Projections for Future Economic Performance, Securities Act Release No. 5992 [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) P 81,756 (Nov 7, 1978).

The SEC's change in policy prompted the courts to re-examine the position that a company's decision not to disclose predictive information is always immune from scrutiny under the securities laws. As a result of these re-examinations, the courts adopted a variety of approaches in dealing with the problem of undisclosed predictions. These approaches range from continuing a prior practice of never requiring that predictive information be disclosed to formulating new standards which recognize that sometimes disclosure will be required. The approaches vary significantly among the circuits and sometimes within the circuit depending on the type of predictive information at issue.[17] *Isquith,* 847 F.2d at 205.

To date the Court of Appeals for the Fifth Circuit has generally refused to "determine when, or even if, predictive information must be disclosed." *Id.* at 206. Therefore, the question of disclosure or

---

**17.** The Supreme Court has taken a position on potential events such as mergers but not on earnings forecasts or projections. *See Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (Rule 10b-5 requires disclosure of the possibility of a merger when the negotiations surrounding the event become "material" to the reasonable investor).

non-disclosure of predictions is an open question in this Circuit.[18]

Porter's allegation that the subjective projections of the future price of oil and gas and the estimated return on capital are material fails as a matter of law. The Court finds Shearson's predictive information is subjective, not material. There was no requirement to disclose this soft information. *Mendell v. Greenberg*, 927 F.2d 667 (2nd Cir.1990) (there is no need to disclose the underlying subjective soft information so long as the objective material facts relating to the transaction are disclosed); *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1202 (S.D.N.Y.1990) (holding faulty economic projections alone will not support a Section 10(b) claim); *Jeffcoat v. Phillips*, 534 S.W.2d 168 (Tex.Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (to be actionable fraud, the misrepresentation must concern material fact as distinguished from mere matter of opinion, judgment, probability or expectation). *See also Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117 (2d Cir.1982); *Boley v. Pineloch Associates, Ltd.*, 700 F.Supp. 673, 679 (S.D.N.Y.1988); *Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 668 (S.D.N.Y.1987). Therefore, Porter's claim for disclosure of written soft information is without merit.

▮▮▮▮▮ Porter's allegation that the brokers allegedly made oral statements regarding the soft information is equally without merit. Reliance on oral statements that conflict with written material contained in the prospectus is unjustified as a matter of law and cannot give rise to a cause of action. *See* discussion *supra* at pp. 57–58.

Under the facts of this case and the SEC statement encouraging, but not requiring, disclosure of predictive information, the Court determines that Shearson did not violate the SEC disclosure requirements. Thus by not disclosing the approximated pro-forma cash flow projections, the estimated future prices of oil and gas, and the approximated period for return of capital in the offering materials, Shearson did not as a matter of law violate the SEC anti-fraud Rule 10b–5.

### 5. Porter Has Not Proven Transaction Causation Nor Loss Causation.

▮▮▮▮▮ Most Courts have bifurcated the causation element of a securities fraud action into the sub-issues of "transaction causation" and "loss causation." *E.g. Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir.1984); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 979–80 (E.D.N.Y.1988); *In re Washington Public Power Supply System Secur. Litigation*, 650 F.Supp. 1346, 1353 (W.D.Wash.1986). In order to recover under Section 10(b) and Rule 10b–5, plaintiff must prove that his monetary loss, if any, was directly and proximately caused by the misrepresentations or omissions he alleges were made. *Platsis*, 642 F.Supp. at 1299. This causation requirement is satisfied only if the misrepresentation touches upon the reason or reasons for plaintiff's pecuniary loss. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981) *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). If the investment decision is induced by misstatements or omissions that are material and are relied upon by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the statute and the rule is not permitted. *Fatakia v. Hanna,* 716 F.Supp. 235, 238 (E.D.La.1989); *Platsis*, 642 F.Supp. at 1299 (plaintiff's claim of causation [was] broken by an "industry wide collapse of oil an gas prices due to deregulation of the oil industry and a glut in oil supplies"); *Fryling v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 593 F.2d 736 (6th Cir.1979) (no causa-

---

**18.** The Court of Appeals for the Fifth Circuit has followed the Supreme Court's position that potential corporate actions or events must be disclosed when the negotiations become material. *See Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075 (5th Cir.1970) (there is no duty to disclose preliminary merger negotiations); *SEC v. Mize*, 615 F.2d 1046, 1051–55 (5th Cir.), *cert. denied*, 449 U.S. 901, 101 S.Ct. 271, 66 L.Ed.2d 131 (1980) (a press release issued during tender offer negotiations was not false and misleading).

tion when "market conditions" rather than fraud are responsible for plaintiff's loss).

A material element of Porter's Rule 10b–5 claim is proof that Shearson's alleged misrepresentation proximately caused his loss. To win, indeed to get past summary judgment, he must produce such evidence. Porter has not met his burden.

Conclusory statements by his attorney are not evidence; nor is his lawyer's sworn affidavit laundry listing of what he believes he can prove if allowed to go on a discovery "fishing expedition."

> "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through offering memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation."

*Bastian v. Petren Resources Corp.*, 892 F.2d 680, 685 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990).

### B. "UNSUITABLE" INVESTMENTS.

1. Private Cause Of Action Against Shearson For Violation Of Dealer Association Rule.

■ Porter alleges that Shearson violated the "suitability" rule and Section 10(b) by recommending investments that were "unsuitable" for his investment objectives.

Article III, § 2 of the National Association of Securities Dealers' ("NASD") Rules of Fair Practice, the "suitability" rule, requires generally that a broker recommend a purchase or sale only after determining that the recommendation is suitable to the customer, and that he use due diligence to learn essential facts regarding the customer. Porter advocates that the "suitability" rule gives rise to an implied private cause of action; Shearson counters that no implied private cause of action exists. The circuits are split on this issue.

(a) Jurisdiction.

The Securities Exchange Act of 1934 did not specifically authorize actions for violation of private associations rules. Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, states:

> "The district courts of the United States ... shall have exclusive jurisdiction of violations ... thereunder, and of all suits in equity and actions brought to enforce any liability or duty *created by this title or the rules and regulations thereunder*." (Emphasis added.)

Section 27 omits the phrase "rules of the exchange." This Court agrees with Judge Friendly's opinion that "by the omission Congress intended that there be conferred on the federal courts exclusive jurisdiction only for violation of rules developed under SEC authority" and not the rules created under dealer association authority. *Colonial Realty Corporation v. Bache & Co.*, 358 F.2d 178 (2d Cir.1965), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). Congress could not have meant that NASD should be given the authority to define new crimes. *Lange v. H. Hertz & Co.*, 418 F.Supp. 1376, 1379 (N.D.Tex.1976).

(b) Implied Civil Liability for Breach of Dealer Association Rules.

In the seminal case *Colonial Realty Corporation v. Bache & Co.*, 358 F.2d 178 (2d Cir.1966), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), Judge Friendly refused to create an implied private cause of action under the NASD Rules.[19] The court held that Congress did not intend that violations of all exchange rules would support a claim for private relief. It found, rather, that the "just and equitable" requirement was extremely broad and that Congress intended to rely only upon the disciplinary function of the exchange to vindicate such broker-dealer misconduct. The court suggested, however, that more specific rules, such as NYSE Rule 452, which outlines the method of voting stock held in a street name, might support a private cause of action because

---

**19.** The case centered on Article III, § 1 of the NASD Rules of Fair Practice, the general business conduct rule, which requires a member to "observe high standards of commercial honor and just and equitable principles of trade."

of the "integral part [it played] in SEC regulation." *Id.* at 182.

This emphasis on the place of the NASD rule in the complete regulation of the securities market gave rise to what has been termed the *Colonial Realty* substitution test. The more specific the rule and the more integral a part it plays in the total scheme of securities regulation, the more likely that the court should infer liability. See Lowenfels, *Private Enforcement in the Over–the–Counter Securities Markets: Implied Liabilities Based on NASD Rules,* 51 Cornell L.Rev. 633, 650 (1966).

In contrast with the analysis in *Colonial Realty* is *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.1969) *cert. denied,* 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), where the Court of Appeals for the Seventh Circuit held that liability could be implied from a breach of New York Stock Exchange ("NYSE") Rule 405.[20] Emphasizing investor protection and the remedial purpose of NYSE Rules instead of stressing, as did *Colonial Realty,* the place the regulation played in the total context of investor protection, the court in *Buttrey* concluded that a violation of NYSE Rule 405, while not *per se* actionable, gives rise to civil liability in cases which "are tantamount to fraud."

Since *Colonial Realty* and *Buttrey* were decided, the Supreme Court, in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), formally set forth four major factors to be considered when determining the existence of a private right of

action under a federal statute which does not provide for one. These factors are (1) where the plaintiff is one of the class for whose especial benefit the statute was created; (2) whether there is any indication of legislative intent, explicit or implicit, either to create or to deny such a remedy; (3) whether it is consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiff; and (4) whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the state, so that it would be inappropriate to infer a cause of action based solely on federal law. *See* Eunice A. Eichelberger, *Annotation, Private Federal Right of Action Against Brokerage Firm for Violation of Exchange or Dealer Association Rule,* 54 A.L.R. Fed. II 1, 3–8 (1991). *See also Lange v. H. Hertz & Co.,* 418 F.Supp. 1376, 1379 (N.D.Tex. 1976) for an extensive analysis of the history, structure and scope of the NASD rules.[21]

The most important factor in the *Cort* case test for determining whether a private right of action exists under a federal statute is whether Congress intended to create, either expressly or by implication, a private cause of action. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), *on remand,* 612 F.2d 68 (2d Cir.1979).[22]

The district courts within the Fifth Circuit are split on whether an implied cause of action may be based on the NASD or stock exchange rules. No implied cause of

---

**20.** NYSE Rule 405, called the Know–Your–Customer Rule, requires that a member use "due diligence to learn the essential facts relative to every customer, order" or account.

**21.** The court addressed a fundamental decision regarding which institution (NASD or the Courts) should have the power, the jurisdiction, to enforce rules which were designed to serve as guidelines for what "ought to be" in the broker dealer world.

"From the ... historical and structural sketch of the place NASD plays in the total scheme of securities regulation, it is clear that the responsibility for policing the unethical was left to NASD with the SEC using anti-fraud provisions of the statute to reach criminal and fraudulent acts. In short, those rules which go beyond that which is simply legal and

which create civil liability have been placed in the hands of NASD and it is this Court's decision that they remain there."
*Lange,* 418 F.Supp. at 1376 n. 2.

**22.** In the *Touche Ross* case and in *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), *on remand,* 610 F.2d 648 (9th Cir.1979), cases which did *not* involve the issue of whether there is a private federal right of action against a brokerage firm for violation of an exchange or NASD rule, the Supreme Court indicated a reluctance to imply a private federal right of action for alleged violation of federal statutes concerning securities investors and investment advisors, where Congress had not expressly created one.

action is recognized in *Lange v. H. Hertz & Co.*, 418 F.Supp. 1376, 1379 (N.D.Tex.1976). A contrary result is reached in *Cook v. Goldman Sachs & Co.*, 726 F.Supp. 151 (S.D.Tex.1989) (relying on a Seventh Circuit decision that an implied private cause of action exists).

Furthermore, the Court of Appeals for the Fifth Circuit has refused to comment on the existence of a private cause of action under the NASD rules. *Jolley v. Welch*, 904 F.2d 988, 993 (5th Cir.1990), *cert. denied*, ── U.S. ──, 111 S.Ct. 762, 112 L.Ed.2d 781 (1991); *Miley v. Oppenheimer & Co.*, 637 F.2d 318 (5th Cir.1981). In both cases, the Fifth Circuit allowed the NYSE and the NASD rules to be considered as one of six factors in determining an element of an excessive trading (churning) violation but not as a private cause of action.

The "suitability" rule is a regulation of the NASD, a private association guideline; not a rule developed under the authority of the SEC, a statute or a law. The special focus of the NASD rules is not and has never been protecting the investor-public, except to the extent that any rule of its type has the effect of protecting the public generally. *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). Therefore, it is this Court's opinion that no private cause of action exists under the "suitability" rule of the NASD.

### (c) An Implied Private Cause of Action for Violation of SEC 10b–5.

 In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court rejected a private implied claim for violation of SEC Rule 10b–5. The Court said that: "In each instance that Congress created express civil liability in favor of purchasers or sellers of securities it is clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake." *Id.* at 207, 96 S.Ct. at 1387. With reference to Rule 10b–5, the Court said that "there is no indication that Congress intended anyone to be made liable for such practices unless he acted other than in good faith." *Id.* at 206, 96 S.Ct. at 1387.

Applying the statements of the Court to Porter's claims asserted under an association rule, something more than mistake or negligence must be shown. The allegation of the instant complaint is that the Programs were "unsuitable ... in that the level of risk was unacceptable" and that the Plaintiff "trusted [Shearson] in connection with [Shearson's] recommendation of the Programs as low risk." Porter's claim is not "tantamount to fraud" and therefore is not *per se* actionable. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 142 (7th Cir.1969) *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969). The prospectus clearly indicated the risks associated with the Programs, Porter admitted to receiving a copy of the prospectus, therefore Porter cannot now claim fraud in hindsight because of his lack of due diligence in reading the prospectus.

Even assuming that unsuitable recommendations may be reached through Section 10(b) or Rule 10b–5, as suggested by *Utah State University of Agriculture & Applied Science v. Bear Stearns & Co.*, 549 F.2d 164 (10th Cir.1977), *cert. denied*, 434 U.S. 890, 98 S.Ct. 264, 54 L.Ed.2d 176 (1977), a plaintiff must still establish the necessary scienter in order to prevail. There is no showing that the actions of Shearson were reckless or intentionally misleading with regard to the suitability of the programs. There is no evidence that any one of the 89 Plaintiffs were mislead as to the suitability of the programs for his investment portfolio. Therefore, Porter has failed to prove a necessary element, scienter, regardless of whether a private cause of action exists or not.

### 2. Suitability Standards Contained in the Subscription Agreements of the Prospectus.

 Each investor warranted meeting minimum qualification criteria with respect to net worth and income as detailed in the prospectus. In signing the subscription agreement contained in the prospectus, each investor represented and warranted

that he met these suitability standards. A prospective investor met the standards in one of following ways:

> "The undersigned has either (a) a net worth of at least $25,000 and had during his last tax year, or estimates that he will have during the current tax year, 'taxable income' ... of at least $25,000; or (b) a net worth of $90,000 or more or, is purchasing in a fiduciary capacity for a person or entity having such net worth or such taxable income. Resident of the states of Arizona, California, Illinois, represented that they have (i) a net worth of at last $100,000 or (ii) a net worth of at least $40,000 and taxable income, ... for the last tax year as estimated for the current tax year, of $40,000 or more, without regard to investment in the program.... Residents of the state of Illinois represent that they have either: (i) a net worth of $100,000 or (ii) a net worth of at least $35,000 and taxable income of $35,000. Residents of the state of North Carolina represent that: (i) they have a net worth of at least $150,000 or (ii) a net worth of $60,000 and taxable income of $60,000. Investors must exclude from the calculation of such net worth the fair market value of their homes, furnishings and cars."

Porter warranted meeting the Programs' required suitability standards. Therefore Porter is estopped from asserting that he did not meet the suitability standards.

## IV. COMMON LAW CLAIMS.

Under the principles of pendent jurisdiction, Porter also asserts common law claims for fraud and breach of fiduciary duty. Because the Court is dismissing the federal claims before trial or discovery, the state law claims must be dismissed. *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1205 (S.D.N.Y.1990).

## V. ALLEGED VIOLATION OF FEDERAL RICO ACT, 18 U.S.C. §§ 1961, *ET SEQ.*

■ The Court ordered that Porter submit a RICO Case Statement. This order was imposed to establish a uniform and efficient procedure for processing this case. The order provided:

> "The Plaintiff shall file, no later than end of business February 21, 1992, a RICO case statement. This statement shall include the facts the Plaintiff is relying upon to initiate this RICO complaint as a result of the "reasonable inquiry" required by Fed.R.Civ.P. 11. In particular, this statement shall be in a form which uses the numbers and letters as set forth below and shall state in detail and with specificity the following information."

■ There are eight elements that must be pled before a plaintiff may avail himself of the enhanced damage and attorney fees provisions of the RICO Act: (1) that defendant (2) through commission of two of the enumerated predicate acts, (3) which constitute a "pattern" of (4) "racketeering activity," (5) directly or indirectly participates in the conduct of (6) an "enterprise," (7) the activities of which affect interstate or foreign commerce, and that (8) plaintiff was injured in his business or property by reason of such conduct. *Taylor v. Bear Stearns & Co.*, 572 F.Supp. 667 (N.D.Ga. 1983).

The predicate acts necessary for stating a civil RICO claim are found in 18 U.S.C. § 1961(1), which states as follows:

> (1) "racketeering activity" means ...
>
> (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341.[23]

The Court's instructions for the RICO case statement regarding "racketeering activity" were as follows:

> "5. Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering shall include the following information:

**23.** This section relates to mail fraud.

a. List the alleged predicate acts and the specific statutes which were allegedly violated;

b. Provide the dates of the predicate acts, the participants in the predicate acts, and a description of the facts surrounding the predicate acts;

c. If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstance constituting fraud or mistake shall be stated in particularity." Fed.R.Civ.P. 9(b). Identify the time, place and contents of the alleged misrepresentation, and the identity of persons to whom and by whom the alleged misrepresentation was made;

d. State whether there has been a criminal conviction for violation of the predicate acts;

e. State whether civil litigation has resulted in a judgment in regard to the predicate acts;

f. Describe how the predicate acts form a "pattern of racketeering activity"; and

g. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe in detail."

In his RICO Case Statement filed February 21, 1992, Porter asserted the following:

"5. (a and c) I. All of the Defendants violated Section 10(b) of the Securities and Exchange Act of 1934:

(i) by making false representation and omissions regarding the unsuitability of the securities of the 1982 program;

(ii) by failing to disclose the high risk nature and the accurate projections of the 1982 Program in its prospectus;

(iii) by making false representation and omissions regarding the unsuitability of the securities of the 1984 Program;

(iv) by failing to disclose the high risk nature and the accurate projections of the 1984 Program in its prospectus; (v) (sic) by making false representation and omissions regarding the unsuitability of the securities of the 1985 Program;

(vi) by failing to disclose the high risk nature and the accurate projections of the 1985 Program in its prospectus;

and

(vii) Hutton violated Section 10(b) by making false representation and omissions regarding the unsuitability of the securities of American Completion limited partnerships that were promoted in a similar format and modus operandi as the Energy Assets Programs.

II. Violation of 18 U.S.C. § 1341 (mail fraud)

(a-c) The Defendants used and caused to be used the U.S. mails in furtherance of the scheme to defraud conservative investors by mail or causing to be mailed the Energy Asset prospectus for the 1982 Program, the 1984 Program, and the 1985 Program in December, 1982, February, 1984 and May, 1985, respectively to hundreds of plaintiffs. (sic) and by promoting the scheme through numerous mailings to Hutton's account executives.

The misrepresentations are set forth above.

These fraudulent statements were made by Hutton's account executives to the Plaintiffs and other prospective investors at the time their investments in the Programs were solicited. The identity of the Plaintiffs and their respective account executives is disclosed on Exhibit A of the Complaint. (See attached.) (b) (sic) The Defendants made the misrepresentation and omissions regarding the Energy Assets program in 1982, 1984 and 1985. Hutton made the misrepresentations and omissions regarding American completion investment in 1983.

(d) There has been no criminal conviction for violation of the predicate acts.

(e) There is not civil judgment in regard to the predicate acts.

(f-g) (sic) The predicate acts form a pattern of racketeering activity because they are related—ie. distribution of prospectuses to hundreds of investors, and the same misrepresentation to hundreds of investors regarding the purported low risk nature of the investments. The acts took place within four years, between 1982 and 1986, a substantial period of time adequate to demonstrate "continui-

ty." The common plan was for Hutton to market the high risk investment to conservative investors."

The Court finds that after given the opportunity to cure the deficiencies in the RICO pleading, Porter has failed to meet his burden. Neither the offering materials nor the suitability standards contain any misleading material facts or omissions in violation of Section 10(b) or Rule 10b-5.

## VI. CONCLUSION.

For the foregoing reasons, it is RECOMMENDED that Defendant Shearson's motion for summary judgment be GRANTED and that the Plaintiff Porter's state law claims be DISMISSED without prejudice.

The Clerk shall file this instrument and mail a copy to all parties. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Nettles v. Wainwright,* 677 F.2d 404 (5th Cir.1982) (*en banc*); *Ware v. King,* 694 F.2d 89 (5th Cir.1982); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). The original of any written objections shall be filed with the U.S. District Clerk, P.O. Box 61010, Houston, Texas 77208 and a copy shall be delivered to the Chambers of Judge Rainey, Room 8613 and to the Chambers of Judge Stacy, Room 7525.

Signed at Houston, Texas, this *16th* day of *March,* 1992.