# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-09-00566-CV

**David Fernea, Appellant**

**v.**

**Merrill Lynch Pierce Fenner & Smith, Inc., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
### NO. D-1-GN-09-002195, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING

## O P I N I O N

We withdraw the opinion and judgment issued herein on January 7, 2011 and issue the following opinion in place of the earlier one.

Appellant David Fernea sued appellee Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch") asserting various causes of action arising from its alleged failure to adequately supervise its employee, Terry Christopher Bounds, in the sale of a portion of his outside businesses to Fernea. Merrill Lynch moved for summary judgment, attaching affidavits to its motion as evidence. Fernea objected to the affidavits on several grounds. The trial court overruled Fernea's objections and granted summary judgment in favor of Merrill Lynch. In eleven issues, Fernea asserts that the trial court erred in overruling his objections to Merrill Lynch's summary-judgment affidavits

and in granting summary judgment for Merrill Lynch on each of his claims. We will affirm in part and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Bounds is an employee of Merrill Lynch and a licensed securities broker. Bounds also owned two "outside" direct-marketing corporations that were unrelated to his employment at Merrill Lynch. Bounds decided to sell his interests in those companies and, according to Fernea, solicited Fernea to "purchase shares" in the businesses. After negotiation, Fernea agreed to buy a fifty-percent interest in each company. Fernea alleged that, "[a]fter receiving payment, Bounds refused to perform his side of the agreement, concealing his actions by delivering a fake stock certificate for 1000 shares of 'Bounds & Pinto, Inc.,' an illegal, non-existent corporation with a deceptively similar name [to the companies' actual names]." Fernea asserted that Bounds made numerous misrepresentations and omissions to induce Fernea to purchase the stock. The alleged omissions included Bounds's failure to disclose that the stock being sold was not and had never been registered with the Texas State Securities Board and that Bounds's companies had been the subject of consumer-protection litigation by the Texas Attorney General. Fernea also contended that Bounds "secretly and repeatedly attempted to resell to others the same corporations previously sold to Fernea." Although Fernea and Bounds had become acquainted socially, and Fernea was not a customer of Merrill Lynch, Fernea asserted that the "relationship between Merrill Lynch and Bounds was important" to him in deciding to invest in Bounds's companies because he "thought that [affiliation] . . . would weigh heavily [against] any possible deception on [Bounds's] part."

2

The parties dispute the extent of Merrill Lynch's awareness of Bounds's sale to Fernea. Merrill Lynch admitted that it knew of the attorney general's consumer-protection litigation and had, as a result, undertaken an investigation of Bounds's outside companies, specifically inquiring into whether Bounds had met his disclosure responsibilities to Merrill Lynch. Referencing Merrill Lynch's internal documents and testimony by Bounds, Fernea alleges that "[a]s a part of its investigation, Merrill Lynch was notified that Bounds intended to sell a portion of his interest in the corporations." In particular, Fernea points to a "Letter of Education" addressed to Bounds from his superiors at Merrill Lynch that reprimanded him for failing to accurately report his outside companies' lines of business. The letter noted that, as a "mitigating factor" in Merrill Lynch's decision not to take sterner disciplinary action, Bounds had decided to "sell [his] outside business to devote more time and effort to growing [his] business at the Firm." Fernea asserts that this document is evidence that "Merrill Lynch knew the corporations were both Sub-C corporations and knew that Bounds's holdings in the corporations were evidenced by stock." Fernea also alleges that "[a]lthough Merrill Lynch knew that Bounds was trying to sell his interest in the corporations—interests held in stock—Merrill Lynch made no attempt to inquire about the sale, its terms, or the registration of the securities."

Fernea filed suit against Bounds, Bounds's companies, and Merrill Lynch, seeking damages and rescission of the transaction. Fernea alleged five causes of action against Merrill Lynch: (1) violation of section 33 of the Texas Securities Act, the "aider and abettor" liability provision; (2) violations of several internal rules of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"); (3) negligence for violating Merrill

3

Lynch's internal policies with respect to outside transactions conducted by its employees; (4) negligent supervision of Bounds with respect to his outside transactions; and (5) "control person" liability under the Texas Securities Act.[1]

Merrill Lynch moved for summary judgment, asserting that (1) Fernea could provide no evidence on several of the elements of aider-and-abettor liability; (2) there is no private right of action for a violation of NYSE and NASD rules or internal company policies, or, in the alternative, the evidence conclusively proved that no violations occurred; (3) Merrill Lynch had no duty to Fernea with respect to a violation of its internal policies, or, in the alternative, the evidence conclusively proved that no violation occurred; (4) Fernea failed to state a claim for negligent training and supervision because Merrill Lynch did not owe him a duty and the evidence conclusively disproved proximate cause; and (5) Merrill Lynch was not liable under the Texas Securities Act because, as a matter of law, it was not a "control person" as that term is defined in the statute.

Fernea objected to portions of the affidavits attached to Merrill Lynch's motion. After a hearing, the trial court overruled Fernea's objections and granted summary judgment in favor of Merrill Lynch on all of Fernea's claims. The court then severed Fernea's claims against Merrill Lynch from those against the other defendants, making the summary judgment final and appealable as to Merrill Lynch. Fernea perfected this appeal.

---

[1] Fernea also pleaded that Bounds was acting as Merrill Lynch's agent in the transaction, but does not appeal the trial court's grant of summary judgment on the claims founded on that theory of liability.

4

**STANDARD OF REVIEW**

Whether summary judgment is proper is a question of law that we review de novo. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). "Traditional" summary judgment is proper if (1) there are no genuine issues of material fact, and (2) the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "If the movant establishes the right to judgment, the burden shifts to the nonmovant to raise a fact issue that would preclude summary judgment." *Virginia Indonesia Co. v. Harris County Appraisal Dist.*, 910 S.W.2d 905, 907 (Tex. 1995). A defendant who conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215-16 (Tex. 2003).

"To prevail on a no-evidence summary-judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's claim." *Southwest Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002) (citing Tex. R. Civ. P. 166a(i)). The burden then shifts to the nonmovant to produce more than a scintilla of probative evidence to support each challenged element of its claims. *Forbes, Inc. v. Granada Biosciences*, 124 S.W.3d 167, 172 (Tex. 2003). More than a scintilla of evidence exists when reasonable and fair-minded people could differ in their conclusions based on the evidence in the record. *Id.*; *see also Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) ("When the evidence offered to prove a vital fact is so weak as

to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983))). "Both direct and circumstantial evidence may be used to establish any material fact." *Ford Motor Co.*, 135 S.W.3d at 601. "To raise a genuine issue of material fact, however, the evidence must transcend mere suspicion. . . . Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Id.* We review "the evidence . . . in the light most favorable to the non-movant." *Id.*

## DISCUSSION

### *No-Evidence Summary Judgment Generally*

We begin by addressing Fernea's eleventh issue, in which he asserts in general terms that the trial court erred in granting Merrill Lynch's no-evidence motion. Although the parties briefed this appeal as if Merrill Lynch had properly sought both traditional and no-evidence summary judgment on each of Fernea's claims, a review of the motion shows that Merrill Lynch asserted a proper no-evidence motion only as to Fernea's aider-and-abettor claim under the Texas Securities Act. Although Merrill Lynch's motion also stated that "[t]here has been adequate time for discovery, and there is no evidence of one or more essential elements of the Plaintiff's causes of action against Merrill Lynch," such a statement does not, by itself, meet the requirements of a no-evidence motion for summary judgment. *See* Tex. R. Civ. P. 166a(i) ("The motion must state the elements as to which there is no evidence."); *Dibco Underground, Inc. v. JCF Bridge & Concrete, Inc.*, No. 03-09-00255-CV, 2010 WL 1413071, at *6 (Tex. App.—Austin Apr. 8, 2010, no pet.) (mem. op.) (movant's motion must clearly set out specific no-evidence challenge to elements of each cause

6

of action). Except as to the aider-and-abettor claim, therefore, we consider only whether "traditional" summary judgment was proper as to Fernea's causes of action and need not address Fernea's eleventh issue.

**Violation of NASD and NYSE Rules[2]**

In his first two issues, Fernea asserts that the trial court erred in granting summary judgment on his claim that Merrill Lynch violated three securities-industry rules—two promulgated by the NASD and one by the NYSE. He argues that he is entitled to bring a private cause of action against Merrill Lynch for its alleged violations and that a fact question exists as to whether Merrill Lynch violated the rules in question.[3] In its motion for summary judgment, Merrill Lynch argued that Congress did not intend to create a private cause of action for a violation of NASD and NYSE rules or, in the alternative, that its evidence conclusively proved that no violation took place.

*Private Cause of Action*

The San Antonio Court of Appeals is the only Texas appellate court that has addressed whether there is a private cause of action for violation of securities-industry rules. Relying

---

[2] The NASD is a "a self-regulatory organization overseeing securities transactions." *In re Next Fin. Group, Inc.*, 271 S.W.3d 263, 265 (Tex. 2008) (per curiam). Although the NASD "absorbed the enforcement arm of the New York Stock Exchange and became the Financial Industry Regulation Authority (FINRA) on July 30, 2007," *see McArdle v. Jack Nelson IRA*, No. 03-08-00057-CV, 2010 WL 1253571, at *1 n.1 (Tex. App.—Austin Mar. 31, 2010, no pet.) (mem. op.), we will still refer to the NASD and the NYSE for convenience. Pursuant to SEC regulations, licensed securities brokers must register with and abide by the organization's guidelines. *Id.*; *see also* 17 C.F.R. § 240.15b7-1 (2009).

[3] Although Fernea does not state whether his private cause of action arises under federal securities law or Texas law, self-regulating securities organizations are entities created and governed by federal statute and regulation. Accordingly, we assume that any private cause of action would arise from federal securities law.

7

on a federal district court opinion from the Southern District of Texas, and without further discussion, the court of appeals held that "there is no independent cause of action for NASD violations." *Milan v. Dean Witter Reynolds, Inc.*, 90 S.W.3d 760, 767 (Tex. App.—San Antonio 2002, pet. denied) (citing *Porter v. Shearson Lehman Bros., Inc.*, 802 F. Supp. 41, 63 (S.D. Tex. 1992)). The Fifth Circuit has not addressed the issue, *see Lang v. French*, 154 F.3d 217, 222 n.26 (5th Cir. 1998), and federal district courts in Texas are split, *compare Cook v. Goldman, Sachs & Co.*, 726 F. Supp. 151, 156 (S.D. Tex. 1989) (implied private cause of action exists), *with Porter*, 802 F. Supp. at 63 (implied private cause of action does not exist), *and Lange v. H. Hentz & Co.*, 418 F. Supp. 1376, 1383 (N.D. Tex. 1976) (same).

Fernea relies on two cases to support his assertion that Congress intended to create a private cause of action: *Buttery v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 142 (7th Cir. 1969), and *Cook*, 726 F. Supp. at 156. The great weight of authority, however, holds against inferring a private cause of action for violations of NASD and NYSE rules. We find the cases Fernea cites for the opposite view unpersuasive. *Buttery*, a Seventh Circuit case, was decided prior to three key Supreme Court decisions setting forth the test for implying statutorily based private causes of action. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979) ("The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction."); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) ("As we recently have emphasized, the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person. Instead, our task is limited solely to determining whether Congress intended to create the private right of

action." (internal quotation marks omitted)); *Cort v. Ash*, 422 U.S. 66, 78 (1975) (establishing four-factor test later compressed and refined by *Touche Ross* and *Transamerica*). Despite being handed down a decade after *Transamerica*, *Cook*, a Texas federal district court opinion, relied heavily on *Buttery*, its progeny, and other cases that pre-date *Cort*. The *Cook* court did not discuss whether *Buttery* was still good authority considering that *Transamerica* largely rejected the test that the *Buttery* court had employed. *See Transamerica*, 444 U.S. at 15-16 ("While some opinions of the Court have placed considerable emphasis upon the desirability of implying private rights of action in order to provide remedies thought to effectuate the purposes of a given statute, what must ultimately be determined is whether Congress intended to create the private remedy asserted, as our recent decisions have made clear."). Thus, like *Buttery*, *Cook*'s authority is questionable.

Post-*Transamerica* decisions employing that case's reasoning consistently hold that Congress did not intend to create a private cause of action for violations of self-regulating organizations' rules. *See, e.g.*, *In re Verifone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (dismissing claims for violations of NASD and NYSE rules because "[i]t is well established that violations of an exchange rule will not support a private claim"); *Hosworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3rd Cir. 1990) (no private right of action for violation of NASD rules); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir. 1990) (same); *Thompson v. Smith Barney, Harris Upham & Co.*, 709 F.2d 1413, 1419 (11th Cir. 1983) (same); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 681 (9th Cir. 1980) ("Based upon the standards in *Touche Ross* and *Transamerica*, we conclude there is no implied right of action for an NASD rule violation."); *Porter*, 802 F. Supp. at 63; *Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 532F. Supp. 480

9

(S.D. Ohio 1982) (under *Cort*, no implied right of action under NYSE or NASD rules); *Klitzman v. Bache Halsey*, 499 F. Supp. 255 (S.D.N.Y. 1980) (no private right of action under NASD rules). Even the NASD's own arbitration panel has recognized that no private cause of action exists for violating its rules. *See Penzer v. Advest, Inc.*, No. 92-00400, 1993 WL 603507, at *5 (NASD Nov. 5, 1993) ("[C]ase law supports the conclusion that no private right of action exists for breach of NASD rules." (citing *SSH Co. v. Shearson Lehman Bros., Inc.*, 678 F. Supp. 1055, 1058 (S.D.N.Y. 1987))).

We agree. Although we need not revisit here the detailed analyses performed in the cases cited above, we will briefly summarize them. The relevant inquiry is to determine whether Congress intended to create a private cause of action for a violation of NASD and NYSE rules in the Securities and Exchange Act of 1934 by employing the usual rules of statutory construction. *See Transamerica*, 444 U.S. at 15; *Jablon*, 614 F.2d at 681; *see also Touche Ross*, 442 U.S. at 568 (describing inquiry in determining Congressional intent). As the *Jablon* court and others have noted, Congress specifically provided for private causes of action for violations of some securities rules, yet did not provide a cause of action for violations of NASD and NYSE rules. *See Jablon*, 614 F.2d at 681. Accordingly, we conclude that Congress did not intend to create a private right of action here. *Id.* at 680-81; *see also Touche Ross*, 442 U.S. at 568 ("The source of plaintiffs' [private right of action] must be found, if at all, in the substantive provisions of the 1934 Act which they seek to enforce . . . .").

Because there is no private cause of action for violation of NYSE and NASD rules, the trial court did not err in granting summary judgment in favor of Merrill Lynch as to that claim. We overrule Fernea's first and second issues.

### Negligence Claim for Violation of Merrill Lynch's Internal Company Policies

In his third issue, Fernea asserts that the trial court erred in granting summary judgment on his claim that Merrill Lynch negligently breached its internal policies "when the evidence showed that [Merrill Lynch] had received the notice to trigger its duties under its policies." Fernea asserts that Merrill Lynch had a legal duty under its policies to monitor Bounds's outside business activities for the protection of the investing public once it undertook to adopt those policies. Although the general rule is that, outside of certain special relationships, the law imposes no duty to take action to prevent harm to another, Fernea premises the existence of such a legal duty here on the "voluntary-undertaking" exception. Merrill Lynch argues that it owed no duty to Fernea as a matter of law or, alternatively, that it presented conclusive evidence that it complied with its internal company policies.

A cause of action for negligence arises when an actor breaches a legal duty and the breach proximately causes damages. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008). Whether a legal duty exists is a question of law. *Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 267 S.W.3d 9, 12 (Tex. 2008). "Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances." *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). The supreme court has recognized, however, that "a duty to use reasonable care may arise when a person undertakes to provide services

11

to another, either gratuitously or for compensation." *Id.*; *see also Carter v. Abbyad*, 299 S.W.3d 892, 895 (Tex. App.—Austin 2009, no pet.) ("A party who agrees to attempt to help someone else has a duty to provide that help without negligently harming the person in need."); *Keightley v. Republic Ins. Co.*, 946 S.W.2d 124, 129 (Tex. App.—Austin 1997, no writ) ("[T]he law places a duty of ordinary care upon any person who voluntarily enters upon an affirmative course of action affecting another's interest."). "A person's duty to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking." *Torrington Co.*, 46 S.W.3d at 837 (quoting *Fort Bend County Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 397 (Tex. 1991)).

The supreme court has cited the voluntary-undertaking test articulated in section 323 of the Restatement (Second) of Torts:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a)     his failure to exercise such care increases the risk of such harm, or
>
> (b)     the harm is suffered because of the other's reliance upon the undertaking.

*Id.* at 838 (quoting Restatement (Second) of Torts § 323 (1965)). Although it has been debated whether the supreme court has actually adopted this section of the Restatement, *see Texas Farm Bureau Ins. Co. v. Sears*, 54 S.W.3d 361, 368 (Tex. App.—Waco 2001), *rev'd on other grounds*, 84 S.W.3d 604 (Tex. 2002), the elements of the test the court has applied are substantially similar. To hold a defendant liable for negligence under a voluntary-undertaking theory, the plaintiff must

establish that (1) the defendant voluntarily undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance or (4) the defendant's performance increased the plaintiff's risk of harm. *Torrington Co.*, 46 S.W.3d at 838-39.

Fernea asserts that the voluntary undertaking in question was Merrill Lynch's adoption of internal procedures regarding employee-owned outside interests. He asserts that Merrill Lynch's duty arises from its voluntary adoption of measures designed to protect members of the public, like Fernea, who transact business with Merrill Lynch brokers acting outside the scope of their business with the firm.

As to reliance, there is no indication that Fernea was even aware of the existence of Merrill Lynch's internal company policies, much less that he relied on such policies. As to risk of harm, we conclude that Merrill Lynch's adopting a set of internal operating policies and procedures did not, without more, increase the risk of harm to Fernea. Although the contours of the voluntary-undertaking doctrine are not clearly defined, voluntarily undertaking to render services requires, at a minimum, that an actor take some active step directed toward a third person—something more than merely enacting general guidelines. *Cf. id.* at 839 (manufacturer of helicopter rotor bearings undertook voluntary efforts to investigate helicopter accident and allegedly provided negligently incomplete information about scope of problem to customers); *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976) (lender voluntarily undertook action to insure borrower's property and did so negligently); *Willowbrook Foods, Inc. v. Grinnell Corp.*,

13

147 S.W.3d 492, 499 (Tex. App.—San Antonio 2004, pet. denied) (affirming summary judgment because plaintiff provided no evidence that third-party finance company, which knew of product defect, voluntarily undertook to inform plaintiff of that defect before purchase). Here, there is no nexus between Merrill Lynch's voluntary undertaking—i.e., the adoption of its policies—and its alleged negligence. That is, Fernea does not allege that Merrill Lynch negligently *adopted* its policies. Rather, he asserts that Merrill Lynch was negligent in later failing to *follow* them. To fall within the voluntary-undertaking exception, however, the plaintiff must allege that the defendant's negligence occurred in performing the undertaking itself. *Torrington Co.*, 46 S.W.3d at 838-39. Thus, to recover here, Fernea needed to allege that Merrill Lynch was negligent in adopting its policies, not in later failing to carry them out. Consequently, even assuming that Merrill Lynch negligently failed to follow its policies, it cannot be liable to Fernea under the voluntary-undertaking doctrine.[4]

We hold that Merrill Lynch's adoption of policies and procedures did not itself increase the risk of harm to Fernea and therefore did not create a duty to Fernea under the voluntary-undertaking exception to the no-duty rule. Thus, the trial court did not err in granting summary judgment in favor of Merrill Lynch on Fernea's claim for negligence in violating Merrill Lynch's internal company policies. We overrule Fernea's third issue.

---

[4] Moreover, some courts have held that the voluntary-undertaking exception to the no-duty rule applies only to "situations where bodily injury or [physical] injury to property belonging to the party is involved." *Wal-Mart Stores, Inc. v. Lane*, 31 S.W.3d 282, 293 (Tex. App.—Corpus Christi 2000, pet. denied); *see also Sibley v. Kaiser Found. Health Plan of Tex.*, 998 S.W.2d 399, 403 (Tex. App.—Texarkana 1999, no pet.). Here, no physical injury or property damage was alleged.

14

***Negligent Supervision***[5]

Before addressing Fernea's fourth and fifth issues, we turn to his sixth, in which he asserts that the trial court erred in granting summary judgment in favor of Merrill Lynch on his claim for negligent supervision. Fernea asserts that Merrill Lynch owed him a duty to supervise Bounds because Fernea was "a member of the general public" and, more specifically, a member of "the investing public." He asserts that his injury, economic harm stemming from alleged securities fraud, "is precisely the type of harm by one of its investment advisors that would be foreseeable to Merrill Lynch." Citing NASD rules, he argues that Merrill Lynch had the authority and the duty to supervise Bounds in this transaction. Merrill Lynch argues that Fernea's negligent-supervision claim fails because (1) Merrill Lynch did not owe Fernea a duty; (2) there was no connection between the damages Fernea suffered and Bounds's employment with Merrill Lynch; (3) Fernea cannot establish the element of proximate causation; and (4) the evidence shows that Merrill Lynch properly supervised Bounds.

As discussed above, a cause of action for negligence arises when an actor breaches a legal duty and the breach proximately causes damages. *Hogue*, 271 S.W.3d at 246. Although the Texas Supreme Court has "not ruled definitively on the existence, elements, and scope of such torts . . . as negligent training and hiring," *see Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010), this Court and other courts of appeals have held that the law imposes a duty on an

---

[5] Although sometimes argued by the parties as a cause of action for negligent supervision *and training*, Fernea's petition alleged only that Merrill Lynch negligently failed to supervise Bounds. Accordingly, we need only address the parties' arguments with respect to that claim.

employer under certain circumstances to use reasonable care in hiring, training, and supervising its employees, *see Houser v. Smith*, 968 S.W.2d 542, 544 (Tex. App.—Austin 1998, no pet.).[6]

"While the employee need not be acting in the scope of his employment to impose liability on the employer, the theory of negligent hiring and supervision does require that a plaintiff's harm be the result of the employment." *Id.* Stated another way, "[t]he employer-employee relationship . . . may create a duty to a third party only if the third party's harm is brought about by reason of the employment and is, in some manner, job-related."[7] *Capece v. Navisite, Inc.*, No. 03-02-00113-CV, 2002 WL 31769032, at *4 (Tex. App.—Austin Dec. 12, 2002, no pet.) (mem. op.); *see also Guidry v. National Freight, Inc.*, 944 S.W.2d 807, 809 (Tex. App.—Austin 1997, no writ).

---

[6] The tort of negligent hiring, supervision, or training is a direct tort brought against an employer, separate and apart from a claim for vicarious liability. *Houser v. Smith*, 968 S.W.2d 542, 544 n.4 (Tex. App.—Austin 1998, no pet.).

[7] Several of our sister courts have also held that an employer's duty in hiring, training, and supervision only requires it to prevent its employees from causing *physical* harm to third parties. *See Wrenn v. G.A.T.X. Logistics, Inc.*, 73 S.W.3d 489, 496 (Tex. App.—Fort Worth 2002, no pet.) ("The duty of the employer extends only to prevent the employee or independent contractor from causing physical harm to a third party."); *Sibley*, 998 S.W.2d at 403-04 (same); *Verinakis v. Medical Profiles, Inc.*, 987 S.W.2d 90, 97-98 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (same) (citing Restatement (Second) of Torts § 315); *see also McClure v. Kingwood Pines Hosp., L.L.C.*, No. 14-09-00339-CV, 2010 WL 3583193, at *2 (Tex. App.—Houston [14th Dist.] Sept. 16, 2010, pet. filed) (mem. op.) (declining to reconsider whether physical harm is requirement for recovery); *Doege v. Sid Peterson Mem'l Hosp.*, No. 04-04-00570-CV, 2005 WL 1521193, at *7 (Tex. App.—San Antonio June 29, 2005, pet. denied) (mem. op.) (physical harm required for recovery). This Court has not addressed whether the duty to hire, train, and supervise only extends to protecting third parties from physical harm, nor is it necessary for us to do so here. Merrill Lynch did not argue to the trial court—nor does it argue on appeal—that Fernea's lack of physical damages was a ground for granting summary judgment. *See Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002) ("A court cannot grant summary judgment on grounds that were not presented.").

16

This "nexus" requirement has also been stated in terms of proximate cause. *See LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d 127, 137 (Tex. App.—Amarillo 1997, writ denied) ("[T]he negligence in [hiring, training, or supervising] must be the proximate cause of the injuries to the plaintiff."); *Robertson v. Church of God, Int'l*, 978 S.W.2d 120, 125 (Tex. App.—Tyler 1997, pet. denied) (same). Courts discuss the nexus requirement in terms of both duty and proximate cause because the requirement is, at its core, one of foreseeability, and foreseeability is an essential component of both proximate cause and duty. *Mellon Mortg. Co. v. Holder*, 5 S.W.3d 654, 659 (Tex. 1999) ("The questions of duty and proximate cause are often used in a confused and overlapping way because both rest on a determination of foreseeability." (internal quotation marks omitted)). The nexus requirement limits an employer's liability to prevent an employer from becoming "an insurer of the safety of every person who happens to come into contact with his employee simply because of his status as an employee." *Houser*, 968 S.W.2d at 544 (internal quotation marks omitted); *see LaBella*, 942 S.W.2d at 137.

Fernea asserts that Merrill Lynch's duty to him arose as a result of NASD rules that, according to Fernea, defined Merrill Lynch's duty to supervise Bounds. Assuming without deciding that NASD rules defined Merrill Lynch's duty to Fernea under Texas negligence law, *see Lange*, 418 F. Supp. at 1383 ("[R]ules of this sort have served as bench marks for a determination of the reasonableness of a defendant's actions."), nonetheless Merrill Lynch's evidence conclusively established that it did not have sufficient notice of the transaction to trigger the supervisory duty at issue in the present case.

Fernea cites NASD Rules 3030 and 3040 as relevant here. Rule 3030 states:

> No person associated with a member in any registered capacity shall be employed by, or accept compensation from, any other person as a result of any business activity, other than a passive investment, outside the scope of his relationship with his employer firm, unless he has provided prompt written notice to the member. Such notice shall be in the form required by the member. Activities subject to the requirements of Rule 3040 shall be exempted from this requirement.

NASD Rule 3030. The plain language of that rule does not impose a duty on Merrill Lynch; rather, it imposes a duty on *Bounds* to disclose his outside interests to the firm. As such, it does not, by itself, support a negligence claim against Merrill Lynch.

Rule 3040 prohibits any person—e.g., Bounds—"associated with [an NASD] member"—e.g., Merrill Lynch—from participating in a private securities transaction "except in accordance with the requirements of this Rule." *Id.* R. 3040(a). A private securities transaction is defined as "any securities transaction outside the regular course or scope of an associated person's employment with a member." *Id.* R. 3040(e)(1). Because the securities in a private transaction are sold "away" from the member firm—i.e., not as part of the member's business—these sales are often called "selling away" transactions and are disfavored because of a heightened potential for fraud. Thus, rule 3040 prohibits selling away unless such a transaction is conducted "in accordance with the requirements of this Rule." The rule requires that if, as here, a security is sold for compensation, the associated person is required to give written notice to the member "describing in detail the proposed transaction and the person's proposed role therein and stating whether [the associated person] has received or may receive selling compensation in connection with this transaction." After receiving notice, the member must either approve or disapprove of the outside transaction in writing.

18

*Id.* R. 3040(b)-(c). If it disapproves of the transaction, the associated person may not "participate in the transaction in any matter, directly or indirectly." *Id.* R. 3040(c)(3). If it approves the transaction, the member is required to record the transaction on its books and "supervise the person's participation in the transaction as if the transaction were executed on behalf of the member." *Id.* R. 3040(c)(2).

Merrill Lynch argues that its summary-judgment evidence conclusively established that it did not receive sufficient notice of Bounds's transaction with Fernea to trigger its supervisory duty under rule 3040, and thus it owed no duty to Fernea. As evidence, it presented affidavit and deposition testimony from Bounds and Charlotte Logann, Merrill Lynch's Austin-area Business Administrative Manager, who also served as the local compliance officer.

As Fernea correctly notes, both Logann and Bounds are interested witnesses because they are Merrill Lynch employees. Nonetheless, rule 166a states that "[a] summary judgment may be based on the uncontroverted testimonial evidence of an interested witness . . . if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c). Fernea asserts that the affidavit testimony of Bounds and Logann fails to conclusively prove lack of notice because (1) the testimony has been controverted by Merrill Lynch's documentary evidence and by the witnesses' own testimony; (2) the testimony is "not clear, positive, and direct, or free of contradictions"; and (3) the underlying issue of fact—whether notice was given—cannot be readily controverted because Merrill Lynch "has sole possession of its documentation, and has objected to discovery related to this issue on the basis of attorney/client privilege."

19

We agree with Fernea that Bounds's affidavit testimony cannot be used to support summary judgment for Merrill Lynch. Fernea's testimony regarding Bounds's allegedly fraudulent conduct casts doubt on Bounds's general credibility as a witness. Thus, we conclude that his testimony is not the "otherwise credible" evidence of an interested witness that is required to support summary judgment. *See* Tex. R. Civ. P. 166a(c).

Logann's testimony, however, is a different matter. Logann, on behalf of Merrill Lynch, averred that the company never received notice of the transaction between Bounds and Fernea. She stated that, in late 2005, Bounds "informed Merrill Lynch verbally that he had decided to sell his outside businesses." She testified by affidavit that Bounds "occasionally mentioned to [her] that he was still in the process of selling his business, or that he thought he might have a good prospect for the sale. He never revealed any more detailed information than that." Logann also stated that "Bounds never gave Merrill Lynch written notice of any kind regarding the sale [to Fernea]," and that "Bounds never gave Merrill Lynch written notice that he intended to engage in any activity that might constitute a private securities transaction under NASD Conduct Rule 3040." Logann stated that, before the lawsuit, she had no knowledge that Bounds had actually consummated a sale, sold only a portion of his businesses, sold them to Fernea, or prepared a stock certificate in connection with that transaction. Logann's deposition testimony as to these facts is substantially similar.

*(i) Fernea's Objections to Logann's Affidavit*

Before we address Fernea's assertions that Logann's testimony is contradicted by other evidence, we must consider his seventh through tenth issues in which he asserts that the trial

20

court erred in overruling his objections to Bounds's and Logann's summary-judgment affidavits. Because we have already determined that Bounds's testimony is insufficient to stand as conclusive interested-witness summary-judgment evidence, we will limit our discussion to Logann's affidavit.

We review the trial court's evidentiary rulings for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000). "A trial court 'abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002) (quoting *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985)). Moreover, "[u]nless the trial court's erroneous evidentiary ruling probably caused the rendition of an improper judgment, we will not reverse the ruling." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Fernea objected to Logann's entire affidavit, and specifically to paragraphs 12, 13, 14, 18, and 20, as not based on personal knowledge. Fernea asserts that Logann testified in her deposition that she "played no role in drafting the contents of her affidavit and that Merrill Lynch's lawyer was in charge of what was contained in it." He also asserts that Logann testified that she "lacked enough personal knowledge 'to get her through a conversation sometimes.'" He argues that Logann's deposition testimony casts into doubt whether she had any personal knowledge of the facts in her affidavit, and thus renders her affidavit testimony incompetent. We agree, but only as to paragraphs 14 and 18.

Logann testified as a representative of Merrill Lynch. An individual's position or job responsibilities can qualify her to testify to facts she learns through her actions and responsibilities

21

at her company. *Equisource Realty Corp. v. Crown Life Ins. Co.*, 854 S.W.2d 691, 695 (Tex. App.—Dallas 1993, no writ) (personal knowledge may be established by person's position within company). A corporate employee is generally presumed to possess personal knowledge of facts that she would learn in the usual course of her employment without having to otherwise prove personal knowledge. *See id.*; *see also Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 365-66 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (absent evidence to contrary, affiant's personal knowledge of corporate employment matters assumed because of his position as vice president of finance); *Nortex Drug Distrib., Inc. v. Sunset Trails, Inc.*, No. 05-98-00676-CV, 2000 WL 1230766, at *5 (Tex. App.—Dallas Aug. 31, 2000, no pet.) (mem. op.) (president of company assumed to have personal knowledge of high-level contract negotiations because of his position with company). Thus, absent indications to the contrary, Logann is presumed to possess personal knowledge of facts within the scope of her job as the Austin compliance officer for Merrill Lynch. Moreover, Logann testified that the information in her affidavit, which was drafted by her lawyer, came from "attorney-client conversations" that she had with the lawyer. She also testified that she reviewed the affidavit and made several changes before signing it, and that her affidavit testimony was her own and was accurate. As to paragraphs 14 and 18,[8] however, Logann admitted having limited personal knowledge. In light of such an admission, it was arguably an abuse of discretion to overrule Fernea's objections to those two paragraphs. Any error, however, was harmless because removing paragraphs

---

[8] In paragraphs 14 and 18, Logann averred that Merrill Lynch did not broker the sale of Bound's companies and otherwise had no contact with Fernea, and that Merrill Lynch maintained a reasonable compliance protocol that it did not breach here.

14 and 18 does not affect the strength of Logann's testimony that Merrill Lynch never received written notice from Bounds giving details of his sale of securities to Fernea.

Fernea also objected to various portions of Logann's affidavit as conclusory or unsupported by documentary evidence. He also objected to the court's allowing Logann to amend her affidavit to correct an improperly made authentication of its exhibits. We need not address these objections because Fernea does not object (other than for lack of personal knowledge) to the portions of Logann's testimony that would affect her testimony regarding a lack of notice. Thus, assuming without deciding that the court erred and should have struck the offending paragraphs, any such error would have been harmless for the same reason discussed above.

### (ii) Logann's Affidavit

Substantively, Fernea asserts that Logann's statements concerning Merrill Lynch's lack of notice under rule 3040 are inconsistent with her later testimony and various documents showing that she knew Bounds was preparing to sell his outside businesses and that he held his business in stock. We disagree. Merrill Lynch does not dispute that it knew, at some point in late 2005, that Bounds was planning to sell his businesses. Such knowledge, however, is not inconsistent with Logann's testimony that Merrill Lynch never received detailed written notice about Bounds's eventual sale of securities to Fernea.

Fernea asserts that Bounds's affidavit testimony contradicts Logann's and creates a fact question as to whether Bounds gave Merrill Lynch the required written notice. Fernea relies on the following statements from Bounds's affidavit: "At no time did any of this transaction involve Merrill Lynch or anything to do with my employment at Merrill Lynch. The anticipated listing and

23

sale of my outside interests *was disclosed by me to Merrill Lynch as required*." (Emphasis added.) Fernea asserts that, because we must construe all reasonable inferences in his favor, we must assume that when Bounds said he disclosed his "anticipated listing and sale . . . as required" what he really meant was that he gave Merrill Lynch the detailed written notice of an impending selling-away transaction required by rule 3040 to impose on Merrill Lynch a duty to supervise the transaction. Considering the vagueness of the statement itself and the context in which it appears, however, we conclude that it gives rise to no more than a suspicion or surmise that Bounds gave Merrill Lynch detailed written notice of his securities sale to Fernea. *See Ford Motor Co.*, 135 S.W.3d at 601 (suspicion or surmise of existence of fact is no more than scintilla of evidence). Viewed in context, this is particularly clear. Bounds's affidavit states that he did not know he was selling a security, and that "the stock certificate was never considered by Mr. Fernea or me to represent an official or registered security." He then discusses that his outside companies did not benefit from the sale and that Merrill Lynch had nothing to do with the sale. It would not be a reasonable inference to read Bounds's statement that he disclosed the "anticipated listing and sale" of his outside businesses to mean that, despite the fact that he was unaware that he was selling securities, he gave Merrill Lynch detailed notice that he was selling securities to Fernea, especially as the parties agree that Bounds gave Merrill Lynch notice in late 2005 that he anticipated selling his outside companies.

Finally, Fernea asserts that he is unable to present contradictory documentary evidence because Merrill Lynch withheld such evidence under the guise of attorney-client privilege. But Fernea did not move to compel production of the documents in question despite sufficient

24

opportunity to do so. Without availing himself of the mechanisms at his disposal to acquire the evidence he sought, he cannot now assert that its absence is grounds for reversal.

*(iii) Conclusion*

We hold that Merrill Lynch conclusively established that it did not receive the detailed written notice required by rule 3040 to trigger its duty to supervise Bounds's outside business sale under NASD rules. Consequently, it has conclusively negated the duty element of Fernea's claim for negligent supervision. Having conclusively negated an element of Fernea's claim, Merrill Lynch was entitled to summary judgment on that claim. We overrule Fernea's sixth issue. Also, because any error in the trial court's overruling of Fernea's objections to Merrill Lynch's affidavits was harmless, we overrule his seventh through tenth issues.

### Aider-and-Abettor Liability

In his fourth issue, Fernea asserts that the trial court erred in granting summary judgment on his claim that Merrill Lynch violated section 2 of article 33(F) of the Texas Securities Act, which imposes joint and several liability on aiders and abettors in fraudulent securities transactions. That section states:

> A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

Tex. Rev. Civ. Stat. Ann. art. 581-33F § 2 (West Supp. 2009). To prove aider-and-abettor liability, the plaintiff must demonstrate:

25

(1) that a primary violation of the securities laws occurred; (2) that the alleged aider had "general awareness" of its role in this violation; (3) that the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 568 (S.D. Tex. 2002). Merrill Lynch asserts that Fernea has no evidence of three elements: general awareness, assistance, and either of the two possible culpable mental states.

*General Awareness*

The parties agree that the alleged "primary violation" here is Bounds's sale of unregistered securities to Fernea. Merrill Lynch asserts that it had no awareness of Bounds's sale of those securities to Fernea or that such securities were unregistered. Fernea asserts that "Merrill Lynch had 'general awareness' of the transaction [because it] knew that Bounds had engaged in a sale of securities, as evidenced by the testimony of [two Merrill Lynch representatives], and by the letter of education."

In addition to the letter of education, which we discussed in more detail in the facts section above, Fernea cites the following testimony from Logann and Kent Varner, the Director of Merrill Lynch's Austin "Capitol Complex" where Bounds worked. Logann testified:

Q.      Do you know how in [the letter of education] this sentence was added, "Additionally, management has also considered your decision to sell your outside business to devote more time and effort to growing your business at the firm?" How did that end up in the letter? Do you know?

26

A.     No.  That could have come from conversations with the attorneys and Chris Bounds.

. . . .

Q.     I just—what we do know is that somebody, at least, was notified of [Bounds's] intent to sell [his companies].

A.     Yes.  Mr. Bounds notified them that he wanted to sell his companies.

. . . .

Q.     You mention that when Mr. Bounds—after this investigation was started—or after this attorney general investigation that ended in the letter of education dated December 30, 2005—are you with me?

A.     Yes.

Q.     After that, Mr. Bounds notified you he was selling his business interests, correct?

A.     Well, yes.  Verbally.

Fernea also points to Logann's deposition testimony where she states that she learned in "November or December"—presumably 2006—that Bounds "sold a piece [of his company], not half, but just a portion of [sic] whatever that meant."

Mr. Varner testified:

Q.     Ms. Logann made a comment [in her deposition] at one point that we knew of the transaction, and I asked what—who "we" was referring to.  Do you recall the question?

A.     I do.

Q.     And she said that the "we" referred to you and she and Mr. Bounds.  Correct?

A.     So the transaction, meaning what?

27

Q.  The sale to David Fernea.

A.  I am aware that—I was aware that—that Mr. Bounds was attempting to sell his business.

Q.  Okay.  How did you become aware of that?

A.  Through both Ms. Logann and from Chris Bounds himself.

Q.  Okay.  When you—when did you learn that?

A.  I don't recall the specific timeline on that.

Q.  Can you give me a year?

A.  Probably '06.

Reviewing this testimony and the letter of education in the light most favorable to Fernea and indulging all reasonable inferences in his favor, we conclude that, although the evidence could lead a reasonable fact finder to conclude that Merrill Lynch had a general awareness that Bounds was trying to sell his companies, it does not create more than a mere suspicion or surmise that Merrill Lynch knew of this specific transaction with Fernea.  And, more importantly, it does not give rise to more than a mere suspicion that Merrill Lynch had "a general awareness of its role in the *violation*"—i.e., the actual sale of unregistered securities to Fernea.  *See Frank*, 11 S.W.3d at 384. Logann testified that she discovered at some point that Bounds "sold a piece [of his companies], not half, but just a portion" of them.  Far from giving rise to a reasonable inference that Merrill Lynch had a general awareness about the violation *before* it happened, her testimony is consistent with a conclusion that Merrill Lynch did not become aware of the violation itself until after it had taken place.  Likewise, Varner's testimony and the letter of education, which Varner approved and signed,

28

merely support a conclusion that, at some point prior to Bounds's sale to Fernea, Merrill Lynch had knowledge that Bounds was attempting to sell his companies. That testimony would not allow a reasonable fact finder to conclude that Merrill Lynch had awareness about the nature of the specific transaction at issue here, much less that the sale was conducted illegally.

We conclude that Fernea presented no more than a scintilla of evidence as to the general-awareness element of the aider-and-abettor test. Therefore, the trial court did not err in granting summary judgment in favor of Merrill Lynch on this claim. We need not discuss whether the record contains evidence supporting the other challenged elements of aider-and-abettor liability. We overrule Fernea's fourth issue.

***"Control Person" Liability***

In his fifth issue, Fernea asserts that the trial court erred in granting summary judgment in favor of Merrill Lynch on his claim that Merrill Lynch was liable as a control person of Bounds under section 1 of article 33F of the Texas Securities Act.[9] In resolving this issue, we need not decide whether Merrill Lynch is in fact liable as a control person; rather, we are only asked to determine whether the summary judgment evidence presented demonstrates that a fact issue regarding liability exists. The control-person provision states:

> A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or

---

[9] As discussed above, Merrill Lynch did not move for a no-evidence summary judgment on Fernea's control-person claim. Thus, it bore the burden of either conclusively negating an element of Fernea's cause of action or conclusively proving each element of an applicable affirmative defense. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003).

29

issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

Tex. Rev. Civ. Stat. Ann. art. 581-33F § 1 (West 2010).  The Act does not define "control person," but the word "control"

"is used in the same broad sense as in federal securities law" and means "the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

*Barnes v. SWS Fin. Servs. Inc.*, 97 S.W.3d 759, 763 (Tex. App.—Dallas 2003, no pet.) (quoting Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt.); *see* 17 C.F.R. § 230.405 (2010) (defining "control"). "Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company." Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt.  "The rationale for control person liability is that a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator . . . is not." *Id.*

At trial, the plaintiff bears the initial burden of proving control.  To do so, the plaintiff must prove that the alleged controlling person (1) had actual power or influence over the controlled person, and (2) had the power to control or influence the specific transaction or activity that gave rise to the underlying violation.  *Barnes*, 97 S.W.3d at 763; *Frank*, 11 S.W.3d at 384; *see also Abbott*

30

*v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993). The plaintiff need not prove that the alleged

controlling person culpably participated in the primary violation.[10] *Barnes*, 97 S.W.3d at 763-64.

In describing the circumstances under which control-person liability exists, courts

have identified several factors that may be considered. For example, courts may consider whether

an investor relied on the employee's relationship with the broker-dealer when deciding to make the

challenged investments. *Barnes*, 97 S.W.3d at 764-65; *see also Hauser v. Farrell*, 14 F.3d 1338,

1342 (9th Cir. 1994); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 n.26 (9th Cir. 1990).

In addition, courts have considered whether the securities transaction at issue could only be

performed through an employee's relationship with the associated broker-dealer. *Hauser*, 14 F.3d

at 1341; *Hollinger*, 914 F.2d at 1576 n.26, and courts have also evaluated whether the broker-dealer

was aware of the problematic transactions, *see Barnes*, 97 S.W.3d at 765; *Hauser*, 14 F.3d at 1342.

Here, Merrill Lynch does not dispute that it had "actual power or influence" over

Bounds in a general sense. Rather, it asserts that it was not a controlling person vis-à-vis Bounds

---

[10] The federal courts are split as to whether the plaintiff bears the burden to prove culpable participation. *Compare SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (plaintiff must prove that controlling person "was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person"), *with Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 n.18 (5th Cir. 1993) (noting that earlier Fifth Circuit opinion did not "accurately reflect our rejection . . . of the 'culpable participation' requirement").
The Texarkana Court of Appeals has held that culpable participation is a required element to establish control-person liability. *See Texas Capital Sec. Mgmt., Inc. v. Sandefer*, 80 S.W.3d 260, 268 (Tex. App.—Texarkana 2002, pet. struck). In doing so, the Texarkana court relied solely on the Fifth Circuit's opinion in *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990), which that court later held to be inaccurate. *See Abbott*, 2 F.3d at 620 n.18.
We join our sister courts in Houston and Dallas in rejecting the culpable-participation requirement. *See Barnes v. SWS Fin. Servs. Inc.*, 97 S.W.3d 759, 763 (Tex. App.—Dallas 2003, no pet.); *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

because it did not have the power to control or influence the *specific transaction or activity* that gave rise to the underlying violation. Merrill Lynch acknowledges that it had day-to-day control over Bounds in matters concerning his employment, but it asserts that because the violation in question concerned Bounds's outside businesses, it cannot be considered to have had the power to control Bounds in a transaction involving those entities.

Fernea argues that "Merrill Lynch had control of all aspects of Mr. Bounds's business relevant in this case." He asserts that Merrill Lynch had the power to "approve and monitor and prohibit Mr. Bounds's sale to Mr. Fernea" and to prohibit the transaction altogether. As evidence of its control, Fernea cites Merrill Lynch's responses to his requests for admission and the deposition testimony of Ms. Logann. In her deposition, Ms. Logann testified:

Q. Okay. Can you tell me what happens when—assuming [NASD Rule] 3040 applies, what happens when Merrill Lynch approves the transaction.

A. When Merrill Lynch approves—I would not know that.

Q. Okay. Well, isn't it contained in this rule here, 3040?

A. Well, and I can—let me—allow me to read it.

Q. Sure.

. . . .

Q. Okay. What happens if Merrill Lynch approves the transaction?

A. Well, we'd first have to get written notification.

Q. Okay.

A. And then if they receive—if Merrill Lynch approved it, then it would go on the records of Merrill Lynch.

32

Q. Okay. And they would supervise and monitor the transaction?

A. Yes. They would be required to.

Q. As if it were basically a sale by Merrill Lynch.

A. Yes.

Q. And what would happen if Merrill Lynch disapproved the transaction?

A. Then the transaction should not take place.

Q. In any form or fashion?

A. In any form or fashion.

Fernea presented evidence that Merrill Lynch was aware of both Bounds's ownership of the companies at issue and of his intent to sell them. Moreover, although the transactions at issue were not performed through Bounds's association with Merrill Lynch, Fernea also asserted that the business connection between Bounds and Merrill Lynch factored into his investment decision.

In addition to the foregoing, Fernea relies on the scope of Bound's specific employment relationship with Merrill Lynch. For example, Fernea's request for admission 18 stated:

**REQUEST:** [Admit] that you authorized Bounds' [sic] ownership of the Companies.

**RESPONSE:** Admitted. Although NASD Conduct Rule 3030 does not require that the firm "authorize" outside interests, Merrill Lynch imposes such a requirement. Merrill Lynch admits that it authorized Mr. Bounds's role as a director and officer of PBC Marketing Co., Bounds & Pinto Marketing, and Austrends Co., and employment by Bounds & Pinto Marketing.

33

Merrill Lynch's private-client branch office policy manual prohibited employees from "engaging in any private securities transaction without full disclosure to and prior written approval from the corporation." Logann testified that the practical effect of this policy was that, as a condition of Bounds's employment, he was prohibited from engaging in a private securities sale unless he obtained written permission from Merrill Lynch. *See* Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt. (power to control or influence can arise by contract); *Frank*, 11 S.W.3d at 384 (same). Thus, as a condition of his employment, Bounds agreed not to enter into any outside securities transactions without Merrill Lynch's permission. Such power to control is not dependent on any notice, but rather arises from the employment bargain that Bounds struck with Merrill Lynch. In light of this bargain, we cannot say that Merrill Lynch has conclusively proved that it did not have the power to control or influence the specific transaction at issue here.

Nonetheless, Merrill Lynch contends that its lack of knowledge of and participation in the sale to Fernea prevented it from having control over the specific transaction. We have held above that Merrill Lynch conclusively proved it did not receive written notice of the securities sale to Fernea as required by NASD rule 3040. As previously discussed, such lack of notice means that Merrill Lynch did not have a duty imposed by the rule to approve or deny the transaction. *See* NASD Rule 3040. Merrill Lynch appears to equate this duty with the power to control or influence the specific transaction. We do not think, however, that a *duty* to control Bounds's outside securities transaction is synonymous with the *power* to "control or influence" that transaction. *See Barnes*, 97 S.W.3d at 763. Logically, conclusive proof of the absence of a duty to control does not constitute conclusive proof of the absence of the power to control or influence. *See* Black's Law Dictionary

34

580, 1288 (9th ed. 2009) (defining duty as "a legal obligation that is owed or due to another and that needs to be satisfied; an obligation for which somebody else has a corresponding right"; defining power as "the ability to act or not act; esp., a person's capacity for acting in such a manner as to control someone else's responses"). Accordingly, Merrill Lynch's lack of knowledge of and participation in the sale to Fernea does not constitute conclusive proof that it lacked the power to control or influence the specific transaction.

Even if the plaintiff establishes that a defendant qualifies as a control person, the defendant will not be liable if

> the control person did not know and, in the exercise of reasonable care could not have known of the facts on which the liability is based, e.g. the untruth or omission of material information, or the fact that the securities were not registered and should have been.

Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt.; *see also Barnes*, 97 S.W.3d at 763-64. Such a showing is an affirmative defense for which the defendant bears the burden of proof. Tex. Rev. Civ. Stat. Ann. Art. 581-33F(1); *Barnes*, 97 S.W.3d at 764.

Even assuming that a lack of notice could serve as proof relevant to the affirmative defense by showing that Merrill Lynch did not know of the transactions at issue, lack of notice would not, by itself, establish the second prong of the defense, which requires proof that "in the exercise of reasonable care [the controlling person] could not have known[] of the existence of the facts by reason of which the liability is alleged to exist." Tex. Rev. Civ. Stat. Ann. art. 581-33F(1). Merrill Lynch has not attempted to prove that the second prong of the affirmative defense was met.

35

In light of the foregoing, we conclude that the evidence presented left a fact question regarding whether Merrill Lynch had the power to control or influence the investment transactions at issue and that Merrill Lynch did not conclusively establish both elements of the relevant affirmative defense. Accordingly, the district court erred by granting summary judgment in favor of Merrill Lynch on this claim. We sustain Fernea's fifth issue.[11]

## CONCLUSION

Because the trial court erred in granting summary judgment for Merrill Lynch on Fernea's control-person cause of action, we reverse the court's judgment as to that claim and remand

---

[11] Merrill Lynch argues that *Barnes v. SWS Financial Services* controls the outcome of this case. Although the facts in *Barnes* are similar in some respects to those in the present case, there are critical differences. In that case, Brooks, a registered agent for a broker-dealer, operated an outside business specializing in selling church-related securities. *Barnes*, 97 S.W.3d at 761. Instead of investing the money he received from the securities sales, Brooks spent the money on personal expenses. *Id.* Brooks's investors sued his brokerage firm, asserting that it was liable to them as a control person. The trial court granted summary judgment in favor of the firm, holding that the evidence conclusively established that the firm lacked the power to control the transactions at issue.

*Barnes* differs from the present case in several respects. First, and most importantly here, Merrill Lynch's policies conditioned Bounds's employment on the power to control outside transactions such as the one at issue here. There was no evidence of such an agreement in *Barnes*. Second, the defendant in *Barnes* moved for both no-evidence and traditional summary judgment. Here, Merrill Lynch filed only a traditional motion as to this claim. The *Barnes* court focused largely on the *lack* of evidence establishing control, not solely on the evidence affirmatively demonstrating lack of control, as we must do. *See id.* at 765. Third, the court in *Barnes* made no mention of evidence indicating that the brokerage firm was aware of the problematic transactions. To the contrary, the analysis indicates that the brokerage firm had no knowledge of the transactions because they were not "reported to" the firm. *Id.* Finally, unlike the case here, the summary judgment evidence in Barnes "established many of the appellants were unfamiliar with [the firm] and did not rely on [the firm] in deciding to" make the investments at issue. *Id.*

36

that portion of the cause to the trial court for further proceedings.  We affirm the remainder of the trial court's judgment.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed in part; Reversed and Remanded in part on Motion for Rehearing

Filed:   July 12, 2011